997 A.2d 967

EDWARD W. AND NANCY M. KLUMPP, PLAINTIFFS–
APPELLANTS, v. BOROUGH OF AVALON,
DEFENDANT–RESPONDENT.

Argued March 22, 2010—Decided June 22, 2010.

*Richard M. Hluchan,* argued the cause for appellants (*Hyland Levin,* attorneys).

*Michael J. Donohue,* argued the cause for respondent (*Gruccio, Pepper, De Santo & Ruth,* attorneys).

*Lewin J. Weyl,* Deputy Attorney General, argued the cause for *amicus curiae* New Jersey Department of Environmental Protection (*Paula T. Dow,* Attorney General of New Jersey, attorney; *Lewis A. Scheindlin,* Assistant Attorney General, of counsel).

*Robert M. Washburn,* submitted a brief on behalf of *amicus curiae* Builders League of South Jersey, Inc. (*Flaster/Greenberg,* attorneys).

*Michael J. Fasano,* submitted a brief on behalf of *amicus curiae* New Jersey Land Title Association (*Lomurro, Davison, Eastman & Munoz,* attorneys).

*David G. Evans,* submitted a brief on behalf of *amicus curiae* Pacific Legal Foundation.

*Richard H. Steen,* President–Elect, submitted a brief on behalf of *amicus curiae* New Jersey State Bar Association.

*Ann F. Kiernan,* submitted a brief on behalf of *amicus curiae* National Association of Home Builders.

*Gordon N. Litwin,* submitted a brief on behalf of *amicus curiae* American Littoral Society (*Ansell Zaro Grimm & Aaron,* attorneys; *Andrew J. Provence,* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

In the wake of the 1962 Atlantic nor'easter storm that devastated much of the New Jersey shore, the Borough of Avalon (Borough), acting pursuant to authority granted by legislative enactment, built a protective dune on property owned by Edward and Nancy Klumpp (plaintiffs or the Klumpps). Plaintiffs' appeal challenges the Borough's failure to adhere to procedural requirements in executing the taking of their private beachfront property and, pointedly, raises the question whether they are to be denied relief on the basis that their claim is out of time. Our holding today recognizes, as did the courts below, that a taking of some dimension [1] occurred when the Borough built the protective dune that restricted plaintiffs' ability to utilize their property, but did not provide plaintiffs with compensation for their loss. We further hold that, ordinarily, the relief available to a property holder from a governmental taking accomplished without adherence to the requirements of the Eminent Domain Act of 1971, *N.J.S.A.* 20:3–1 to –50, would be to pursue an inverse condemnation action within the six-year statute of limitations period available under

---

[1] We cannot discern from the present state of this record the precise extent of the taking of plaintiffs' property that occurred following the 1962 storm.

*N.J.S.A.* 2A:14–1. Under the circumstances here, however, equity demands a different result.

Despite acting pursuant to legislative authorization that allowed emergency action subject to later payment of just compensation, the Borough failed to pay just compensation for the private property it seized from plaintiffs. Moreover, the Borough never provided specific notice of its taking of plaintiffs' property and equivocated in even acknowledging the import of its action when plaintiffs tried, in various ways, to reclaim the ability to use their property. Specifically, the Borough failed to identify plaintiffs' property when it announced its initial intention to seize private property in order to create a protective dune in the wake of the 1962 storm, and then denied "taking" plaintiffs' property in response to explicit inquiries from plaintiffs, later adopting a contrary position reflective of the increasingly restrictive terms it placed on the dune-laden property when that suited the Borough's litigation needs. On these unique facts, equity demands that plaintiffs be allowed an exemption from the application of the normal six-year statute of limitations period for the constitutional violation visited on them. Accordingly, we reverse and remand, in limited part, to permit plaintiffs to amend their complaint to add a claim for inverse condemnation and, thus, to pursue valuation of the property at the time of the taking that occurred in or around 1965, when the dune was constructed on their property.

## I.

The facts and history to this matter were developed in the record presented to the trial court initially and amplified on remand from the Appellate Division. We summarize the relevant evidence and the trial court's findings and conclusions based on the record presented.

On January 19, 1960, plaintiffs purchased a block of oceanfront property in the Borough of Avalon. The Borough is situated on a portion of a barrier island called Seven Mile Beach. The Borough's tax map identifies the property at Block 74.03 located at

the eastern end of 75th Street, covering Lots 2, 4, and 6. The dirt road that comprised 75th Street provided the only public access to the property and ended at the sand area of the beach. The Klumpps immediately built a single-family home on their property, which they used during the summers of 1960 and 1961. Their enjoyment of the home was short-lived.

In March 1962, a devastating Atlantic nor'easter storm, dubbed by the U.S. Weather Bureau "The Great Atlantic Storm," struck Seven Mile Beach, causing serious flooding and damage to the coastline and destroying homes and other beachfront properties. *See* Arthur I. Cooperman & Hans E. Rosendal, *Mean Five–Day Pressure Pattern of the Great Atlantic Coast Storm, March 1962*, 91 *Monthly Weather Rev.* 337, 337 (1963); *see also* Larry Savadove & Margaret Thomas Buchholz, *Great Storms of the Jersey Shore* 103 (1993).[2] Immediately after the storm, the Klumpps returned to survey the damage and claim their possessions. They found the house leveled, the roof lying on the ground, and their personal belongings littering their lot. They did not return again until several years had passed.

As a result of the catastrophic damage to the shore communities, the New Jersey Legislature, drawing on the State's emergency powers, enacted legislation to address the emergency caused by the storm's serious erosion and destructive consequences. *See* *N.J.S.A.* App. A:9–51.5 (the Act). In a preamble, the Legislature expressed the dire nature of the situation:

---

[2] The Great Atlantic Storm of March 1962 "has been claimed to be the most damaging extratropical east coast storm of [the] century." Cooperman & Rosendal, *supra*, at 337. In its aftermath, newspapers reported "houses sticking up above the waters like houseboats on a lake." Fred J. Cook, *The Case of the Disappearing Coastline*, N.Y. *Times*, Sept. 25, 1966. Then Governor Richard J. Hughes described the storm as one of the "worst disasters of recent years in New Jersey" and requested that President John F. Kennedy declare the coastal area affected by the storm a "Federal disaster area" and thus provide federal aid. Russell Porter, *Storm Hits Coast 2d Day; 27 Dead, Damage Heavy*, N.Y. *Times*, Mar. 8, 1962 (internal quotation marks omitted). A number of counties, including Cape May County, "declared states of emergencies." *Ibid.*

Whereas, The shores and beaches of this State have been recently devastated by storms, floods and action of the sea to the extent that large sections of the sand barriers which protect the mainland have been washed away and eroded, thereby leaving the remainder of the sand barriers and the shore municipalities in imminent danger of further serious erosion and destruction with consequent peril to life and property; and

Whereas, The existence of this situation has clearly demonstrated the necessity for shore municipalities, under these and similar circumstances, to have clear authority for the undertaking of immediate emergency procedures; and

Whereas, The Legislature finds that such procedures may necessitate authority for the exercise of a right of immediate entry upon property for the purpose of demolishing and removing buildings and structures thereon, and for effecting improvements and repairs so as to prevent a recurrence of such condition. [*L.* 1962, *c.* 48, § 1.]

The operative provisions of the Act authorized those municipalities bordering the Atlantic Ocean where damage occurred, to act pursuant to resolution, and "repair, restore, replace or construct such protective barriers" that were "necessary to the health, safety and welfare of the municipality." *N.J.S.A.* App. A:9–51.5. The municipalities were authorized "to enter immediately upon such property to take control and possession thereof, and to do such acts as may be required, including removing, destroying or otherwise disposing of any property located thereon without first paying any compensation therefor." *N.J.S.A.* App. A:9–51.5.

Pursuant to the Act's authority, on August 15, 1962, the Borough adopted two resolutions at a public meeting. One, entitled "Authorization to Enter Property to be used as protective barriers," authorized the Borough "to take control and possession" of property immediately and "to do such acts as may be required, including removing, destroying or otherwise disposing of any property located thereon without first paying any compensation therefor." *Resolution No.* 62–102. The resolution also duly noted that the Borough could not deny a person with interest in property the right to just compensation if the Borough's occupation of the property amounted to a taking. *Ibid.* The second resolution eliminated the need for compliance with the Borough's public bidding requirements because hurricane season was imminent, and the Borough urgently needed to "construct protective barriers

in the form of Sand Dunes between 13th and 80th Streets." *Resolution No.* 62–103. The resolutions were recorded with the Borough Clerk, however, no actual notice was provided to the Klumpps.[3]

Sometime after the passage of the emergency-related resolutions in 1962, the Borough initiated its dune rebuilding project. It is undisputed that part of the project included the construction of a dune on the Klumpps' property. The Borough limited access to the Klumpps' property by placing around it fences that bordered the beach and the street. The Borough also constructed a footpath for public access to the beach, which crossed the Klumpps' property in certain areas and was marked by fences running along both sides. Plaintiffs acknowledged that when they visited their property "a few years" after the 1962 storm (but sometime prior to 1997), they discovered a dune built on it. With no information from the Borough to the contrary, plaintiffs believed they remained the rightful owners of the property. To confirm that belief, the Klumpps checked the Borough's official town map, which designated their property as under private ownership rather than publicly-owned tax exempt property.

After the dune rebuilding project was completed in April 1965, the Borough adopted a series of ordinances regulating the use of beachfront property. The first of the series, adopted by the Board of Commissioners of the Borough in 1968, *Ordinance No.* 393, established a "dune line" west of the Klumpps' property, which prohibited the redistribution or removal of sand from land east of the dune line. Another, adopted in 1969, vacated the public right of access to a portion of 75th Street, which provided

---

[3] The Borough also initiated a property-exchange program in an effort to compensate property owners whose lots were affected by the storm. *See Raab v. Borough of Avalon,* 392 *N.J.Super.* 499, 505, 921 *A.*2d 470 (App.Div.), *certif. denied,* 192 *N.J.* 475, 932 *A.*2d 26 (2007). The program enabled owners to exchange their properties for lots owned by the Borough. *Ibid.* The record is devoid of any evidence that the Borough offered this property-exchange program to the Klumpps or that the Klumpps were aware of the program's existence.

access to the Klumpps' property, *see Ordinance No.* 416, and in 1971, the Borough adopted another ordinance that required payment from any person who wished to access the beach, *Ordinance No.* 468. Ten years later, in 1979, the Borough changed the zoning district that included plaintiffs' property, and prohibited construction of residential structures within the re-designated area. *Ordinance No.* 614.[4]

Notwithstanding the multiple resolutions and ordinances over time regulating beachfront use and development, and authorizing urgent protective dune system construction, the Borough maintained throughout its pre-litigation dealings with the Klumpps that it had not effectuated a taking of plaintiffs' property and that title to the property remained with the Klumpps. It was not until after the Klumpps commenced litigation that the Borough conceded, in 2005, that a taking had occurred. Previously, the Borough had taken a contrary stance in correspondence between the Klumpps and the Borough. In 1997, the Klumpps' attorney asserted, through a letter to the Borough Clerk, that the Borough's ordinances had deprived the Klumpps of complete use of their property and, thus, effectuated a taking, which entitled them to compensation. A letter response from the Borough Solicitor disputed that a taking had occurred and noted that the current environmental conditions surrounding the property "represent the antithesis of human habitability." The Solicitor also suggested that the New Jersey Department of Environmental Protection (DEP) would deny any application by the Klumpps for a construc-

---

[4] Also in 1979, the Borough adopted *Ordinance No.* 628, which initially prohibited all development on beaches or dunes unless the purpose of the development was only capable of being effectuated in a beach or dune area *and* it would not pose any significant long-term adverse effects to the organic function of the beach and dune system. Later in the same year the ordinance was amended by *Ordinance No.* 236–87, which conditioned all forms of construction in the dune area on approval from the Borough. In 1994, as a condition of accepting funds from the New Jersey Department of Environmental Protection (DEP), the Borough acceded to the imposition of another requirement on property owners who wished to develop on the dune area, namely, DEP approval prior to any building on or around dune areas.

tion permit, even if one were to be approved first by the Borough. Eager to make use of their property, the Klumpps, through their attorney, notified the Borough Solicitor that they would pursue a use variance, as required by Borough ordinance, and reiterated their position that a regulatory taking occurred. Again, the Borough Solicitor's response reasserted that no taking had occurred.

The dispute came to a head in 2003, when the Klumpps applied to the DEP for approval to build a single-family dwelling on their property. The DEP denied the application for a permit because, among other reasons, the Klumpps could not demonstrate that they had access to the property. The Klumpps notified the Borough of the problem, requested a meeting to establish access to the property, and reasserted the illegality of the Borough's regulatory taking without just compensation. The Borough neither responded to that letter, nor to any of the Klumpps' three follow-up letters.

Throughout this period, however, and indeed dating back to the time of the 1962 storm, plaintiffs continued to receive tax bills, which they paid until the instant litigation commenced. The value of their property, as assessed after the storm, never exceeded $300, as compared to the $3,600 valuation prior to the storm.[5] Indeed, as late as 2002, in a letter concerning a revaluation of their property, the Borough's tax assessor addressed the Klumpps as the owners of the property.

The Klumpps filed the complaint commencing this matter on November 18, 2004. They sought a declaratory judgment that they had a right to access the property and that the Borough had the ability to convey access, and sought an order compelling the Borough to provide them with access. The Borough's answer, dated December 17, 2004, admitted that the Klumpps owned the property, denied that the Borough had the ability to convey access, and asserted separate defenses and counterclaims. One

---

[5] The tax bill in 2005 resulted in payment of forty-six cents.

defense and counterclaim contended that the Borough had gained title to the property through adverse possession. The Borough claimed that it had been in actual possession since 1962 when it began to construct a dune on the Klumpps' property. The other counterclaims alleged that the Borough had obtained either a prescriptive or "public trust" easement over the property.

The matter proceeded on cross-motions for summary judgment. The Klumpps moved for judgment granting legal recognition of an implied right of access to their property. The Borough's cross-motion for summary judgment contended that the expiration of the statute of limitations and doctrine of laches barred the Klumpps' claim. In support of its motion, a certification by the Borough Administrator, dated July 29, 2005, asserted for the first time that *Resolution Nos.* 62–102 and 62–103 from 1962 had effectuated a taking of the Klumpps' property as of August 15, 1962.[6]

The trial court granted summary judgment to the Borough and dismissed the Klumpps' complaint without prejudice to their filing an inverse condemnation claim in response to the taking. The court found that the Borough had been in possession of the Klumpps' property since approximately 1962, even though the Klumpps remained record title owners of the property. The Klumpps appealed that decision.

On January 29, 2007, in an unpublished decision, the Appellate Division reversed the trial court's judgment, which dismissed plaintiffs' complaint, and remanded for further proceedings. The panel stated that it "lack[ed] confidence on this record that the Borough" had been in continuous possession of the property since "the early 1960s." The panel found the Borough's assertions that it maintained and monitored the dune after construction was

---

[6] In his certification, the Borough Administrator relied on the trial court's findings in *Raab* to reason that the Klumpps property, which was situated nearby the property at issue in *Raab*, was subject to the same resolutions and dune construction project that constituted the "taking" found in *Raab*. *See Raab, supra,* 392 *N.J.Super.* 499, 921 *A.2d* 470.

complete by 1965 did "not necessarily establish possession," and noted further that a public entity could enter private property temporarily "without continuing to occupy the property." The panel recognized the Klumpps' right to access "the vacated portion of 75th Street," but concluded that it could not determine from the record whether the Borough had the ability to provide that access. Accordingly, the panel remanded for further proceedings.

Following the Appellate Division decision, the Klumpps amended their complaint to include damages for continuing trespass and for ejectment based on unlawful possession. The Borough's answer sought a judgment declaring that: 1) the Borough had effectuated a taking in 1962, which deprived the Klumpps of title to their property; 2) the Klumpps failed to take legal action within six years to recover compensation, their sole remedy; and 3) the Borough is the legal and equitable title owner of the property. The Borough also reasserted its original counterclaims and separate defenses, including adverse possession.

At the remand hearing on January 17, 2008, the following procedural steps helped to focus the proceedings. The Klumpps withdrew their claim for trespass, acknowledging that they could not prove damages. They continued, however, to maintain their action for ejectment, contending that they were the rightful owners of the property and therefore were entitled to a right of access to the property. The Borough admitted that a taking occurred in 1962 and, further, that the Klumpps no longer retained an ownership interest in the property. The Borough maintained that the Klumpps had no right to access the property; however, the Borough conceded that, prior to the assertion of its counterclaim, it never before had alleged that it owned the property.

In reaching its findings and conclusions on the remand issues, the trial court noted that it relied on facts from the proceeding in *Raab v. Borough of Avalon,* 392 *N.J.Super.* 499, 921 *A.*2d 470 (App.Div.), *certif. denied,* 192 *N.J.* 475, 932 *A.*2d 26 (2007). The court then entered judgment for the Borough, dismissing the Klumpps' claims for access to the property, trespass, and eject-

ment. It determined that the Klumpps retained only "bare legal title" to the property. The court also dismissed, as moot, the Borough's counterclaim to title by reason of adverse possession or by prescriptive or "public trust" easement. Because the court determined that the Borough had exclusive possession and control of the property without ever having sought, let alone having obtained, permission from the Klumpps to use or occupy the property, the court found that the Borough's conduct constituted a taking as of 1962. The court also found that a further "regulatory taking" occurred in 1979 when the property was re-zoned from residential to public use. As for the Klumpps' right to access to the property, the court determined that due to DEP regulations and the contractual obligations between the Borough and the DEP, the Borough could no longer provide access to the Klumpps.

The court further found that the Borough's contradictory actions over the years had reinforced the Klumpps' belief that they maintained an ownership interest in the property. The court specifically contrasted the Borough's early assertions that the Klumpps were the owners and its corresponding denials of a taking, with the Borough's later admission, in litigation, that it owned the property and that a taking had occurred. Nevertheless, the court determined that the Klumpps were aware that the Borough had used its property as part of the dune protection program and that they "essentially abandoned any effort to possess or utilize the property after 1962." Because the Klumpps never brought an action seeking compensation, the court found it unnecessary to address application of the statute of limitations for a claim seeking compensation for a regulatory or possessory taking.

The Klumpps appealed again, and the Appellate Division affirmed. The panel stated that "inverse condemnation has occurred, and that the Borough is the true owner of the property." Inverse condemnation, the panel explained, "provides a remedy designed to insure that the owner whose land was taken de facto receives just compensation.... It is the taking of possession

without payment that constitutes the very essence of inverse condemnation." Here, "the tax bills, Borough records, and recorded title ownership" demonstrated, according to the panel, "indicia of plaintiffs' bare legal title ... and nothing more." The panel further described its conclusion that plaintiffs have bare legal title as consistent with its conclusion that inverse condemnation had occurred. It held, therefore, that once the Klumpps became aware of the Borough's physical occupation of their property the burden shifted to them to seek compensation.

Finally, the panel affirmed the trial court's determination that municipal *Ordinance Nos.* 393 and 614 denied the Klumpps all practical and beneficial use of their property and effected a regulatory taking. However, the panel determined that the regulatory taking was a moot issue because the "inverse condemnation occurred by way of the Borough's physical occupation of the property" in 1962.

The Klumpps petitioned for certification, which we granted, 200 *N.J.* 503, 983 *A.2d* 1111 (2009), to review the judgment entered in favor of the Borough and against the Klumpps.

## II.

Several principles of law control the government's actions in respect of the property of its citizens. Basic among them is the constitutional protection against the taking of private property without just compensation. *U.S. Const.* amend. V ("[N]or shall private property be taken for public use, without just compensation."); *N.J. Const.* art. I, ¶ 20 ("Private property shall not be taken for public use without just compensation."); *N.J. Const.* art. IV, § 6, ¶ 3 ("Any agency or political subdivision of the State or any agency of a political subdivision thereof, which may be empowered to take or otherwise acquire private property for any public highway, parkway, airport, place, improvement, or use may be authorized by law to take ...; but such taking shall be with just compensation.").

■ The New Jersey Constitution provides protections against governmental takings of private property without just compensation, coextensive with the Takings Clause of the Fifth Amendment of the United States Constitution. *Mansoldo v. State*, 187 *N.J.* 50, 58, 898 *A.2d* 1018 (2006). The government is forbidden "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Greenway Dev. Co. v. Borough of Paramus*, 163 *N.J.* 546, 553, 750 *A.2d* 764 (2000) (internal quotation marks and citations omitted). A constitutional taking may occur in one of two ways: 1) via physical taking, in which the government takes title to private property or "authorizes a physical occupation [or appropriation] of property"; or 2) via regulatory taking, through which a government regulation deprives the property owner of all economically viable use of their land. *Yee v. Escondido*, 503 *U.S.* 519, 522, 112 *S.Ct.* 1522, 1526, 118 *L.Ed.*2d 153, 162 (1992); *see Lucas v. S.C. Coastal Council*, 505 *U.S.* 1003, 1015, 112 *S.Ct.* 2886, 2893, 120 *L.Ed.*2d 798, 812–13 (1992); *Gardner v. N.J. Pinelands Comm'n*, 125 *N.J.* 193, 205, 593 *A.2d* 251 (1991); *Littman v. Gimello*, 115 *N.J.* 154, 161–62, 557 *A.2d* 314 (1989); *Washington Mkt. Enters. v. City of Trenton*, 68 *N.J.* 107, 117–18, 343 *A.2d* 408 (1975). Physical occupation or appropriation of property is usually an obvious demonstration of a taking and "qualitatively more severe than a" less apparent regulatory taking. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 *U.S.* 419, 436, 102 *S.Ct.* 3164, 3176, 73 *L.Ed.*2d 868, 883 (1982); *see Bernardsville Quarry, Inc. v. Borough of Bernardsville*, 129 *N.J.* 221, 231, 608 *A.2d* 1377 (1992). Regardless of the exact method employed, where a taking occurs, the Takings Clause requires the government to compensate the property owner. *Escondido, supra,* 503 *U.S.* at 522, 112 *S.Ct.* at 1526, 118 *L.Ed.*2d at 162; *see N.J. Const.* art. I, ¶ 20; *N.J. Const.* art. IV, § 6, ¶ 3.

■ Because this matter involves an initial physical taking, our focus is narrowed. To accomplish a physical taking, the government may either enter the land without authorization or

exercise its power of eminent domain through a condemnation proceeding. *United States v. Clarke*, 445 *U.S.* 253, 255–56, 100 *S.Ct.* 1127, 1129–30, 63 *L.Ed.*2d 373, 376–77 (1980) (citing *United States v. Dow*, 357 *U.S.* 17, 21, 78 *S.Ct.* 1039, 1044, 2 *L.Ed.*2d 1109, 1114 (1958)). New Jersey's Eminent Domain Act (EDA) authorizes government seizure of property under certain circumstances requiring a condemnation proceeding. *N.J.S.A.* 20:3–1 to –50. If the government seizes property without first bringing a condemnation proceeding, the burden shifts to the individual to bring an action to compel condemnation, known as "inverse condemnation." *Greenway, supra,* 163 *N.J.* at 553, 750 *A.*2d 764; *Rohaly v. Dep't of Envtl. Prot. & Energy,* 323 *N.J.Super.* 111, 115, 732 *A.*2d 524 (App.Div.1999); *see Clarke, supra,* 445 *U.S.* at 257, 100 *S.Ct.* at 1130, 63 *L.Ed.*2d at 377–78. The concept of inverse condemnation recognizes that the landowner may initiate the action to compel compensation from government; one need not wait in vain for government compensation. *See Clarke,* 445 *U.S.* at 257, 100 *S.Ct.* at 1130, 63 *L.Ed.*2d at 377–78; *Greenway, supra,* 163 *N.J.* at 553, 750 *A.*2d 764. The time frame for pursuing such an action is a question that we have not previously addressed.

### III.

The question of the applicable time frame for commencing an inverse condemnation action has been considered by the appellate courts of our state. The Appellate Division has held that the applicable statute of limitations for bringing an inverse condemnation action is the six-year period set forth in *N.J.S.A.* 2A:14–1. *See Raab, supra,* 392 *N.J.Super.* at 511, 921 *A.*2d 470; *Russo Farms, Inc. v. Vineland Bd. of Educ.,* 280 *N.J.Super.* 320, 327, 655 *A.*2d 447 (App.Div.1995) (finding six-year statute of limitations applicable to plaintiff's inverse condemnation claims), *aff'd in part and rev'd in part on other grounds,* 144 *N.J.* 84, 675 *A.*2d 1077 (1996) (declining to reach statute of limitations issue because issue not raised on appeal); *Harisadan v. City of E. Orange,* 187 *N.J.Super.* 65, 68–69, 453 *A.*2d 888 (App.Div.1982); *see also 287*

*Corp. Ctr. Assocs. v. Twp. of Bridgewater,* 101 *F.*3d 320, 324 (3d Cir.1996) (applying six-year statute of limitations to inverse condemnation claim brought under New Jersey law). *N.J.S.A.* 2A:14–1 provides that

[e]very action at law for trespass to real property, for any tortious injury to real or personal property, for taking, detaining, or converting personal property . . . , or for recovery upon a contractual claim or liability, express or implied . . . shall be commenced within 6 years next after the cause of any such action shall have accrued.

Although the term "inverse condemnation" is not explicitly mentioned in the statute, we agree with the Appellate Division's observations that the concept fits comfortably within the statute's purview. Moreover, holding inverse condemnation actions to the six-year limitations period for trespass and injuries to real property, and implied contract liability, sensibly aligns this aspect of our takings jurisprudence with that of the federal constitutional takings jurisprudence.

■ A six-year statute of limitations governs a landowner's inverse condemnation claim based on the physical taking of land by the federal government. *United States v. Dickinson,* 331 *U.S.* 745, 747, 67 *S.Ct.* 1382, 1384, 91 *L.Ed.* 1789, 1793 (1947). In *Dickinson,* the United States Supreme Court recognized that takings claims were subject to a statute of limitations, and that such claims specifically were governed by the statute of limitations for filing a civil action against the federal government. *Id.* at 746–47, 67 *S.Ct.* at 1383–84, 91 *L.Ed.* at 1792–93.[7] Thus, holding our state inverse condemnation actions to the same time period fosters uniformity and promotes the same interest in timely valuation of a governmental taking, whether the action lies under federal or state constitutional principles.

---

[7] In *Dickinson, supra,* the actions were brought in 1947 under the Tucker Act. 331 *U.S.* at 746–47, 67 *S.Ct.* at 1383–84, 91 *L.Ed.* at 1792–93. The relevant provisions of the Tucker Act that provide the statute of limitations periods for civil actions against the United States government currently appear at 28 *U.S.C.* § 2401.

In canvassing the law of other states, we note that the limitations periods for inverse condemnation actions vary. When there is no statute of limitations on point, some states apply the statute of limitations for adverse possession, or recovery of real estate, to inverse condemnation actions. *See, e.g., Sundell v. New London*, 119 *N.H.* 839, 409 *A.2d* 1315, 1321 (1979) (twenty years); *Reitsma v. Pascoag Reservoir & Dam, LLC*, 774 *A.2d* 826, 837 (R.I.2001) (ten years); *see also* 26 *A.L.R.*4th 68, 71–73, 83–87 (1983) (citing cases and reasoning that just compensation for taking is fundamental constitutional right not to be limited by statutory construction in absence of clear legislative proscription). Conversely, other states have applied statutes of limitations based on, for example, implied contract theory or linkage to general civil statutes, which tend to provide shorter limitations periods. *See, e.g., Beer v. Minn. Power & Light Co.*, 400 *N.W.2d* 732, 735–36 (Minn.1987) (applying separate statute of limitations for inverse condemnation actions; six years for takings resulting from limited access only, and fifteen years for actual taking of property); *Richmeade, L.P. v. City of Richmond*, 267 *Va.* 598, 594 *S.E.2d* 606, 610 (2004) (finding inverse condemnation based on government's breach of implied contract to compensate owner and thus subject to three-year limitations period); *Dep't of Forests, Parks & Rec. v. Town of Ludlow Zoning Bd.*, 177 *Vt.* 623, 869 *A.2d* 603, 607 (2004) (applying general civil statute of limitations, six years, for inverse condemnation action when no statute explicit on inverse condemnation limitations).

In New Jersey, a limitations period of thirty years of actual possession is applied to adverse possession claims to real property, except for woodlands or uncultivated tracts, for which sixty years possession is required. *N.J.S.A.* 2A:14–30. However, in our view, the thirty-year period applicable to private takings of another's real property does not fit with the interests involved when government takes private real property. The government's ability to appropriate private property is tied to the requirement that it put the property to public use. *See N.J. Const.* art. I, ¶ 20. That purpose would be undermined if a long period of uncertainty were

allowed in respect of property ownership, assuming that the State has not commenced condemnation proceedings under the EDA. In circumstances that involve the physical occupation of property by the government, the stark act of the governmental entry and seizure of the property *"requires* the landowner to submit to the physical occupation of his land," *see Yee, supra,* 503 *U.S.* at 527, 112 *S.Ct.* at 1528, 118 *L.Ed.*2d at 165, and thus provides reasonable assurance that the landowner will have adequate notice and opportunity within a six-year period to institute an inverse condemnation action for just compensation. Moreover, the limited time frame for pursuing a compensation claim advances the public interest in providing fair compensation for the government's taking. The closer in time the landowner commences the action, the more precise the valuation, particularly when improvements by the government may be forthcoming and would alter the condition of the property at the time of the taking.

A sounder public policy is advanced by applying the six-year statute of limitations period identified by the Legislature for trespass and injuries to real property to an inverse condemnation claim. It is not insignificant that, were one to apply our state's thirty- or sixty-year adverse possession limitations period to inverse condemnation suits, our state takings jurisprudence would be out of step with the United States Supreme Court's holding as to the applicable time frame in federal takings actions. And, furthermore the application of a six-year limitations period is not inconsistent with positions taken by several sister states.

■ In sum, we hold, for the reasons discussed, that where a governmental entity takes property for public use and provides adequate notice through physical or regulatory action, application of *N.J.S.A.* 2A:14-1's six-year statute of limitations is reasonable, promotes the goals of judicial efficiency and uniformity, and diminishes the uncertainty of property ownership and potential future litigation. Under either principle for accomplishing the taking—physical or regulatory—following the governmental seizure of the property, the cause of action for inverse condemnation

begins to accrue on "the date the landowner becomes aware or, through the exercise of reasonable diligence, should have become aware, that he or she had been deprived of all reasonably beneficial use." *Raab, supra,* 392 *N.J.Super.* at 503, 921 *A.2d* 470 (citing *Russo Farms, Inc., supra,* 280 *N.J.Super.* at 325, 655 *A.2d* 447 and *Harisadan, supra,* 187 *N.J.Super.* at 68–69, 453 *A.2d* 888); *see also Rosenau v. City of New Brunswick,* 51 *N.J.* 130, 137–40, 238 *A.2d* 169 (1968) (finding cause of action for injury to real property under *N.J.S.A.* 2A:14–1 accrues when injury occurs, subject to discovery rule). We therefore turn to the timeliness issue raised in this matter.

## IV.

### A.

Application of the limitations period we have now determined to constrain inverse condemnation actions does not satisfactorily resolve this case. The rub in this matter lies in the trial court's mistaken belief that the facts are on all fours with what occurred in *Raab,* on which the trial court below relied and to which it analogized.

In *Raab,* the Borough directly notified the plaintiffs that, through the property-exchange program, any property taken as part of the dune construction project could be exchanged for other property. *Raab, supra,* 392 *N.J.Super.* at 505–06, 921 *A.2d* 470. As a result, the Appellate Division concluded that the *Raab* plaintiffs were barred from bringing an inverse condemnation action because they were aware of the taking when the Borough took exclusive possession of their property, and had failed to bring their claim within the six-year period. *Id.* at 503, 513, 921 *A.2d* 470.

Here, in contrast, there is no evidence to indicate that the Borough informed the Klumpps of the property-exchange program. Indeed, there is no explanation why the Klumpps were not included in the property-exchange program when their property

clearly was part of the dune construction project. Nor did the Borough directly notify plaintiffs in any other way that it was utilizing its authority under the State Legislature's emergency powers authorization to appropriate the Klumpps' private property as part of its shore protection plan. That is, there was no express admission of such intention until the Borough asserted its position in 2005 that a taking had occurred.

Only when engaged by the Klumpps' litigation did the Borough raise, in each of its answers, a defense of adverse possession, claiming that it had maintained "notorious, actual, adverse, exclusive, continuous, and uninterrupted possession" in excess of forty years. And, in its counterclaim, it sought a declaratory judgment against plaintiffs for title to the land and advanced two bases for that claim of relief: 1) the statutory requirement that an action to recover title to real estate be brought within twenty years of its accrual, *N.J.S.A.* 2A:14–6, and 2) the vesting of title by way of adverse possession, *N.J.S.A.* 2A:14–30. *See J & M Land Co. v. First Union Nat'l Bank,* 166 *N.J.* 493, 517, 766 *A.*2d 1110 (2001) (reaffirming right of entry to recover real estate must be exercised within twenty years). Thus, the Borough maintained that plaintiffs are barred from now making a claim to title because title vested in the Borough through operation of adverse possession and therefore the plaintiffs were not entitled to relief.

Based on the Borough's position up until 2005 that a taking did not occur, plaintiffs understandably sought recourse through demands for access to their property that led to the declaratory judgment action demanding access and the later-added claims for trespass and ejectment of the Borough from their land. After finally conceding, in 2005, that a taking occurred forty-three years earlier, the Borough now attempts to hide behind the six-year statute of limitations to claim that plaintiffs have no right to an inverse condemnation action. In light of these circumstances and in the interest of "justice and fairness," plaintiffs must be afforded a remedy for the appropriation of their property to public use. *See In re "Plan for Orderly Withdrawal from N.J." of Twin City*

*Fire Ins. Co.*, 129 *N.J.* 389, 414, 609 *A*.2d 1248 (1992) (quoting *Penn Cent. Trans. Co. v. New York City,* 438 *U.S.* 104, 124, 98 *S.Ct.* 2646, 2659, 57 *L.Ed.*2d 631, 648 (1978)) (favoring "highly nonformal, open-ended, multi-factor balancing method" to determine when justice and fairness requires government compensation for losses caused to private citizens) (quoting Frank Michelman, *Takings, 1987,* 88 *Colum. L.Rev.* 1600, 1621 (1988)); *cf. W.V. Pangborne & Co. v. N.J. Dep't of Transp.,* 116 *N.J.* 543, 553–57, 562 *A*.2d 222 (1989) (endorsing application of doctrine of equitable estoppel to bar assertion of statute of limitations defense by public entity "to prevent manifest injustice").

### B.

As a reviewing appellate court, we recognize our duty not to "disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." *Abtrax Pharm. v. Elkins–Sinn, Inc.,* 139 *N.J.* 499, 517, 655 *A*.2d 1368 (1995) (internal quotation marks omitted) (quoting *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.,* 65 *N.J.* 474, 484, 323 *A*.2d 495 (1974)). That standard poses no impediment here for we agree with the trial court's conclusion, affirmed by the Appellate Division, that a physical taking of some dimension occurred in respect of the Klumpps' property no later than in 1965.[8]

Immediately after the storm in 1962, the Borough began its dune construction project that ultimately resulted in the construction of a protective dune on a portion of plaintiffs' property. As part of the dune project, the Borough placed fences to limit public access to the property from the beach and street, and it also

---

[8] Because we find that a physical taking occurred and thus plaintiffs have a right to just compensation, we need not reach the issue of whether the ordinances and regulations effectuated a regulatory taking.

constructed a pathway for public access to the beach from the vacated street to the beach that crossed over portions of the Klumpps' property. Those Borough actions constituted a physical taking. Although the Borough did not officially advance the position that it had taken the property until after litigation commenced in 2004, that does not eviscerate the occurrence of the physical taking. *See Clarke, supra,* 445 *U.S.* at 257, 100 *S.Ct.* at 1130, 63 *L.Ed.*2d at 378 ("To accomplish a taking by seizure ... a condemning authority need only occupy the land in question."); *Washington Mkt. Enters., supra,* 68 *N.J.* at 117, 343 *A.*2d 408 ("From [the early] cases there developed the idea of physical invasion or appropriation as the chief criterion for determining whether a 'taking' had occurred."). Although physical invasion and physical taking of real property by a governmental entity ought to be notice sufficient to awaken property owners to act to protect their interest in receiving compensation for the taking, government also should provide some other form of notice to affected property owners before, and surely after, a physical taking. It should go without saying that turning such square corners is minimally what citizens should be able to expect from their government when such drastic action is visited on property owners.

▇▇ Here, instead of assuming responsibility for its taking of the Klumpps' property, the Borough skirted its obligation to answer for its action. The Borough's inconsistent positions toward the Klumpps' status in respect of the property should not be permitted to work to its advantage. We cannot ignore the tax bills that were sent to the Klumpps as owners of this property, the Borough's designation of the property as private on official town maps, and the various contradictory positions taken by the Borough even when faced by assertions that it had taken the Klumpps' property through the erection of a dune with its immediate use restrictions. Thus, while ordinarily a property owner would be expected to protect his or her interests in property that is physically seized through the assertion of a timely inverse condemnation action, here there are multiple reasons for conclud-

ing against strict enforcement of the limitations period for filing such actions.

Although the Klumpps have resorted to the courts seeking only to use their property and have not pled, to date, a claim for inverse condemnation, such a demand was posited to the Borough in their efforts to resolve this matter in 1997, when through a letter to the Borough Clerk, they demanded compensation for the taking of their property. In response, not only did the Borough reject plaintiffs' demand for compensation, it denied that its actions effectuated a taking. Subsequently, when the Klumpps requested a right to access their property in order to fulfill DEP permit requirements, the Borough failed to respond or to provide access, even though the official town map and property tax valuation designated the Klumpps record title owners of the property. The Borough maintained its "no-taking" position until litigation commenced, only then asserting that a taking had occurred in 1962—a position both consistent with its counterclaim for adverse possession and its defense to plaintiffs' claim for a right of access. Government should not be permitted to invoke a legal theory only to abandon it later in favor of another that time-bars an otherwise valid claim. In the face of the positions taken by these parties, it would be unjust to allow this action to end with a judgment both depriving plaintiffs of their property and refusing them any compensation therefor.

Indeed, it bears noting that in the very resolution passed by the Borough in 1962, pursuant to the emergency authorization to shore communities contained in *N.J.S.A.* App. A:9–51.5, the Borough acknowledged its obligation to pay just compensation for the property it was about to seize in order to construct its shore-protecting dune. That promise was not kept in respect of the Klumpps. The Borough cannot now, in equity, stand behind the six-year statute of limitations period for an inverse condemnation action. *See W.V. Pangborne & Co., supra,* 116 *N.J.* at 553–57, 562 *A.*2d 222 (1989). To the extent that the judgment cut off the Klumpps from access to such an action, we reverse and remand. Equity demands that the Klumpps be allowed the opportunity to

amend their complaint to include a claim for inverse condemnation. *See Schiavone Constr. Co. v. Hackensack Meadowlands Dev. Comm'n*, 98 *N.J.* 258, 265–66, 486 *A.*2d 330 (1985). We therefore remand to the trial court for further proceedings to determine the amount of just compensation the Borough must pay to plaintiffs. *See Clarke, supra*, 445 *U.S.* at 258, 100 *S.Ct.* at 1130, 63 *L.Ed.*2d at 378 (setting property value at time of taking); *Washington Mkt. Enters., supra*, 68 *N.J.* at 123–24, 343 *A.*2d 408 (entitling plaintiffs to value of property as of date of taking, plus interest).

### V.

The judgment of the Appellate Division is affirmed in part and reversed in part, and the matter is remanded for further proceedings consistent with this opinion.

*For affirmance in part/for reversal in part/remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.