**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2027-19

NC COMMONS 2016 U.R., LLC,

    Plaintiff-Respondent,

v.

RAYMOND KELLY,

    Defendant-Appellant.

_____

> Submitted February 1, 2021 – Decided March 16, 2021
>
> Before Judges Rothstadt and Susswein.
>
> On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. LT-022327-19.
>
> Rutgers Law School Civil Justice Clinic, attorneys for appellant (Victor Monterrosa and Norrinda Brown Hayat, of counsel and on the briefs; Akua Dawes, Kamaria Guity, Sabah Abbasi, Jaedon Huie, admitted pursuant to Rule 1:21-3(b), on the briefs).
>
> The Law Office of Jeffrey R. Kuschner, attorneys for respondent (Lindsay R. Baretz, on the brief).

PER CURIAM

In this residential tenancy action, we address when to fix the effective date for a reduction in rent for a tenant whose rent is subsidized by a federal program and who experiences a reduction in income. For the reasons stated in this opinion, we hold that where an interim recertification of income is completed, the effective date under federal regulations is the date of the action that caused the interim recertification, such as a tenant's loss of employment, even if the tenant delays reporting the decrease in income to his or her landlord.

The tenant, defendant Raymond Kelly, appeals from the Special Civil Part's October 30, 2019 judgment of possession that was entered after the trial court determined there was unpaid rent owed by defendant to his landlord, plaintiff NC Commons 2016 U.R., LLC, under a lease that required his rent to be aligned with his income because he participated in a federal rent subsidy program. On appeal, defendant contends that the trial court did not correctly calculate his rent in accordance with federal law and that it "erred" in determining that rent was legally due and owing under the Anti Eviction Act, N.J.S.A. 2A:18-61.1 to -61.12, because defendant violated the applicable federal regulations by not reducing his rent retroactive to the first of the month after he experienced a reduction in his income.

Defendant, a 65-year-old disabled senior citizen, rented an apartment from plaintiff in 2017 at its building located in Newark. There are 376 units in plaintiff's building. All of its tenants participate in subsidy programs. For that reason, recertifications of program eligibility and income are performed annually for all tenants to ensure their rent is limited to thirty percent of their income. The federal government pays the balance of approved market rent.[1] As discussed in more detail below, because a tenant's rent is tied to his or her income, the program required tenants to report, among other things, any increase in their income during their leases' term, which would then trigger a recertification process to determine whether they were still eligible and if so, to calculate a new rent based on the additional income.

Prior to becoming unemployed in February 2019, defendant had worked as a construction worker through a temporary employment agency. In the fall of 2018, he completed the recertification process and based on his verified

---

[1] As defendant's counsel explained, defendant participated in the Section 8 housing choice voucher program. That program "provides financial assistance to eligible individuals so that they may rent privately owned housing. An individual deemed eligible for Section 8 housing assistance is issued a housing choice voucher which verifies eligibility for assistance and that money is being set aside to assist the individual with paying his or her rent." Pasquince v. Brighton Arms Apts., 378 N.J. Super. 588, 591 n. 1 (App. Div. 2005).

A-2027-19

income his monthly rent was fixed at $681, effective December 1, 2018 as stated in his one-year lease with plaintiff.

Defendant was employed for most of 2018, but at the time defendant renewed his lease in 2018, he had been unemployed for two months and was relying solely on his social security disability benefits for income. Thereafter, defendant returned to work on a temporary basis and remained employed through February 2019. He stopped working in February 2019 but received compensation from his employment through March 2019. Afterward, he only had his social security disability income to rely upon.

In September 2019, as also discussed in more detail below, defendant underwent his annual recertification and simultaneously an interim recertification because he advised plaintiff that he had stopped working in February 2019 due to his medical issue. Based on that information, plaintiff recalculated defendant's rent and effective October 1, 2019, it was reduced to $252 per month. At the time, defendant was in arrears in the payment of his prior rent for approximately seven months.

Prior to plaintiff filing its complaint in this action, on several occasions during 2019, defendant had conversations with representatives of plaintiff in which he stated that he was having financial difficulty and did not "have the

4

money" due to funeral expenses he was incurring for his late brother. During those conversations, defendant never stated that he was no longer working nor did he request an interim recertification.

Because defendant had not paid his rent on multiple occasions when due, prior to his recertification, on July 25, 2019, plaintiff filed its complaint[2] in this action seeking possession of the premises. Evidently,[3] the parties went to court in September 2019, and trial was scheduled for October 30, 2019. Before the parties returned to court, and still in September, defendant met with plaintiff's representative to compile paperwork for his annual recertification. They handled his interim recertification at the same time. That process resulted in defendant's rent reduction effective the first of the month following recertification, which was October 1.

Although the parties resolved the issue of defendant's rent going forward, by the new trial date they had not resolved the alleged outstanding rent. Two days before the scheduled trial date, defendant filed a motion to dismiss the

---

[2] Contrary to the requirements of Rule 2:6-1(a)(1), defendant has not provided us with a copy of the pleading in his appendix.

[3] We reach this conclusion based upon the undisputed trial testimony of plaintiff's representative and defense counsel's statements at trial.

A-2027-19

complaint based upon plaintiff's alleged violation of federal law and regulations governing defendant's tenancy.[4]

At trial, the court first addressed defendant's motion. After considering the parties' arguments and citing to Housing Authority of Passaic v. Torres, 143 N.J. Super. 231 (App. Div. 1976), the trial court acknowledged that a landlord subject to the federal regulations could not seek from a tenant rent that does not comply with the regulations because it is not "legally due and owing." It then concluded that it could not determine whether the rent claimed by plaintiff was due and owing until it had heard the testimony of the parties, so the matter proceeded to trial.

During the trial, plaintiff's representative Geraldine Bruce testified as did defendant. Bruce, who was the assistant property manager for plaintiff, testified to the rent owed and as to the manner that plaintiff addressed recertification of tenants under the federal program. According to Bruce, plaintiff typically started to speak to tenants about the recertification process when they come in to pay their rent in advance of a new lease term. And, in anticipation of those

---

[4] Here, again, contrary to Rule 2:6-1(a)(2), defendant has not provided us with a copy of the motion or any supporting submissions. Because the court's decision referred to the motion to dismiss, it should have been included. R. 2:6-1(a)(2).

A-2027-19

discussions, plaintiff sends notices to tenants beginning "one hundred twenty days in advance," and thereafter ninety, sixty and thirty days "before its done." Sixty days before, plaintiff would seek to secure employment verification through its service provider in anticipation of recertification.

As Bruce explained, the recertification is typically "constrained to the six pay periods prior to the recertification" and for that reason "[t]hey used the last six pay stubs." Ultimately the tenant's rent is calculated by "a certified occupancy specialist" who is "certified by the federal government to calculate the tenants rent." The rent is then approved by the Housing and Mortgage Financing Agency (HMFA). And, upon receipt of the certification or approval, a letter is sent notifying the tenant and requesting that they come in to sign the lease. She explained typically when a tenant requests an interim recertification, plaintiff conducts the same employment verification and reviews submissions made by the tenant demonstrating their income as verified by their employers confirming their income or stating that the effective date of their termination or change in hours of employment.

This was the procedure that she followed with defendant leading to the execution of the December 2018 lease. In anticipation of defendant's recertification, plaintiff received a handwritten statement from defendant listing

his wages. Bruce explained the difficulty she experienced in verifying his income in 2018 and how she ultimately confirmed his income through an employment verification system.

Bruce then testified to defendant's subsequent visits to the office complaining that "he didn't have the money" because he had to pay for his brother's funeral. She said these visits happened almost every other day. She confirmed that defendant never asked for an interim recertification. Nor did he bring any evidence of his then current income or verification that he had stopped working. Defendant never submitted such documentation to plaintiff prior to September 2019.

According to Bruce, in September 2019, defendant told her he was not working because of his need for a foot operation. Plaintiff then "removed his income" from employment in its calculations and relied only on his social security benefits, when it conducted both an interim and annual rectification because the information he provided revealed an earlier loss of income.

When the interim and annual recertifications were completed, defendant's rent was lowered to $252 per month effective October 1, 2019, because the recertified rent goes into effect the first of the month after it is completed. So had defendant submitted the information in support of a request for

recertification showing his loss of income earlier, his rent would have been reduced on the first of the month thereafter.

Bruce also confirmed the months for which defendant had not previously paid rent during 2019. She noted that of those months he paid rent on March 4th, April 3rd, and June 3rd. At the end of September 2019, defendant's outstanding rent balance was $3,697.

In defendant's testimony, he initially addressed his employment history. He explained that he was unemployed since February 2019 and before that was doing work through various temporary employment agency which he began in approximately June 2017.

Defendant then addressed his income. He explained that since his unemployment he received social security benefits in the amount of $956.00 per month.

According to defendant he pursued an interim recertification in October 2019 because he "stopped working in September." At that time, he went to plaintiff's office and brought his last six pay stubs. Despite his previous statement that he stopped working in September, defendant explained that in February 2019 he stopped working because he went to his "foot doctor" who said he needed surgery and was then told by the employer secured by the temp

9

agency that he should not return to work. He has never been employed since then. Defendant had the anticipated surgery in September 2019, which prompted him to notify plaintiff he had stopped working.

Defendant acknowledged that he understood his lease required him to report any changes in household income to his landlord. He confirmed that when he moved into the building in February 2017, he only had income from social security and was not working. As revealed in his 2018 recertification, he worked during 2017 but had not informed plaintiff of his change in income. Defendant maintained that he did not report that 2017 income, but that he told plaintiff's representatives that he was working during that period.

In response to questioning by the court, defendant confirmed that after he was not allowed to return to work in February, he did not advise plaintiff. He also confirmed that when he spoke to plaintiff's representative he told them that he "was paying [his] rent but . . . had two brothers pass away, one this year in January, one last year in February, got another brother that is on his deathbed too." Defendant did not state that he had any change in income, but rather, he explained that he had funeral expenses.

After considering counsel's closing arguments, the court placed its decision on the record. Initially, the court made credibility determinations as to

the two witnesses and found them both honest. The court explained that defendant testified he stopped working in February 2019 and that the court found him very credible and believed him. The court also specifically found that based on the conversation that defendant had with plaintiff about his loss of his brothers and the difficulty it imposed on him, defendant did not "inform the plaintiff that he had a decrease in income." Instead, the court found that defendant "informed them that he had a problem because of his brother passing away." The court then found that plaintiff did not violate the regulations and defendant owed $3,697 in rent. The court entered its judgment accordingly.

Thereafter, defendant filed a motion for reconsideration that the court denied. In its order denying relief, the court again found that defendant did not advise plaintiff he had a loss of income until September 2019 and when he did, plaintiff conducted an interim recertification that changed his rent effective October 1, 2019.

Turning to the regulations and citing the "HUD Handbook 7-13(D)" the court quoted the circumstances when a landlord can initiate interim recertification, which included where it discovers an undisclosed increase in the tenant's income. As to a "rent decrease" the regulations stated that the recertification based on the decreases is "implemented effective the first rent

period following completion of the recertification" and that "[t]enants may request an interim recertification due to any changes occurring since the last recertification that may affect the TTP [Total Tenant Portion] or tenant rent and assistance payment for the tenant."

Prior to the court determining the outcome of his motion for reconsideration, defendant tendered to plaintiff all outstanding rent. For that reason, defendant was not evicted and remains in possession of the premises. This appeal followed.

A party seeking to overturn a judgment of possession must demonstrate on appeal that the judge abused his or her discretion in entering the judgment. Cmty. Realty Mgmt. v. Harris, 155 N.J. 212, 236 (1998). We will not disturb the factual findings of the trial judge unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Klump v. Borough of Avalon, 202 N.J. 390, 412 (2010) (quoting Abtrax Pharm. v. Elkins-Sinn, Inc., 139 N.J. 499, 517 (1995)). We review a trial court's conclusions of law de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 379 (1995).

Here, we review de novo because the trial court's determination of the rent reduction's effective date is a legal conclusion that was based on its review of

the U.S. Department of Housing and Urban Development's Handbook.[5] See generally U.S. Dep't of Hous. & Urb. Dev., HUD Handbook No. 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs (Nov. 2013) (HUD Handbook). We conclude from our review that the court erred when it held that the reduction could only be applied prospectively and not retroactive to defendant's loss of employment.

"Under federal law, an owner landlord is required to satisfy specific requirements when attempting to terminate a subsidized tenancy. We have held federal requirements to be jurisdictional prerequisites to the establishment of good cause for eviction in state court." Riverview Towers Assocs. v. Jones, 358 N.J. Super. 85, 88 (App. Div. 2003). And, we recently held that the federal requirements preempt the Anti Eviction Act. See Summit Plaza Assocs. v. Kolta, 462 N.J. Super. 401, 410 (App. Div.) (finding that N.J.S.A. 2A:18-16.1(f) is preempted by Supremacy Clause), certif. denied, 244 N.J. 145 (2020).

Whether the trial court here had jurisdiction and, if so, properly calculated the amount due and owing as rent, turned on whether defendant was entitled to a reduction in his rent retroactive to the first of the month following his

---

[5] Evidently, at trial, the HUD Handbook was admitted into evidence. Like other items that were also admitted, defendant did not include copies of what the trial court considered in his appendix, again contrary to Rule 2:6-1(a)(1)(I).

unemployment, even though he never, as the trial court found, formally requested an interim reclassification until September 2019. To determine the answer, resort must be made to the governing regulations.

The policies and procedures governing the recertification process are contained in the HUD Handbook. "The HUD Handbook 'is a one-source "rule book" on the occupancy policies and procedures governing the subsidized multifamily programs' of HUD." Kuzuri Kijiji, Inc. v. Bryan, 371 N.J. Super. 263, 265 (App. Div. 2004). The procedures set forth in the HUD Handbook are clear and straightforward and are detailed to protect the significant property right a tenant possesses to a subsidized housing voucher, and the federal government's concomitant interests in ensuring an accurate and equitable distribution of those benefits.

As explained in the HUD Handbook, one of the program's "key requirements" is "[t]o ensure that assisted tenants pay rents commensurate with their ability to pay." HUD Handbook, § 7-4(A). For that reason, it requires that at least annually, landlords "must conduct a recertification of family income and composition at least annually [and] then recompute the tenants' rents and assistance payments, if applicable, based on the information gathered." Id. § 7-4(A)(1). See also 24 C.F.R. § 5.657(b) (2020). And, tenants are required to

"supply information requested by the owner or HUD for use in a regularly scheduled recertification."  HUD Handbook, § 7-4(A)(2).  See also 24 C.F.R. § 5.659(b)(2) (2018).  The HUD Handbook imposes deadlines for the completion of the annual review and requirements for the landlord to commence the process by sending the tenant various notices.  See HUD Handbook, §§ 7-5, 7-7.

If a tenant fails to respond to the landlord's notice and does not provide the required information, that tenant could lose the subsidy.  Id. §§ 7-8(D)(2), 7-8(D)(3)(b).  Before that happens, the landlord "must inquire whether extenuating circumstances prevented the tenant from responding prior to the anniversary date."  Id. § 7-8(D)(4).  "Extenuating circumstances" are defined as "circumstances beyond the tenant's control."  Id. § 7-8(D)(4)(a).  "If the owner determines that extenuating circumstances were present[,]" the subsidy will be reinstated "retroactively to the recertification anniversary date."  Id. § 7-8(D)(5)(b).

The HUD Handbook also provides for interim recertifications.  Unlike annual recertifications, an interim recertification requires the tenant to initiate the process and to provide supporting documentation.  Under certain circumstances, such as where the tenant's family's composition changes, id. §§ 7-10(A)(1), (2), or the family income increases, id. §§ 7-10(A)(3), (4), the tenant

15                                                              A-2027-19

is required to notify the landlord that a change has occurred so that an interim recertification can be conducted. Id. § 7-10(A).

However, the HUD Handbook makes it optional for a tenant to report a decrease in income or an increase in certain expenses that would warrant an interim recertification leading to a reduction in rent. Id. § 7-10(B). Such circumstances expressly include "[d]ecreases in income including . . . loss of employment," id. § 7-10(B)(1), and "a family member . . . becoming a person with a disability," id. § 7-10(B)(3).

A landlord is only required to complete an interim recertification "if a tenant reports" a decrease in income, unless "[t]he decrease was caused by [the tenant's] deliberate action . . . to avoid paying rent," id. §§ 7-11(A)(4), 7-11(D)(1), or if the decrease is temporary, id. §7-11(D)(2). In any event, the interim recertification must be completed "within a reasonable time, which is only the amount of time needed to verify the information provided by the tenant. Generally, this should not exceed 4 weeks." Id. §7-11(C). The steps a landlord must follow are dependent upon whether they are in response to a tenant satisfying his reporting obligation or requesting an interim recertification, see id. § 7-12(A)(1)-(5), or if the landlord "learn[ed] that a tenant failed to report a change in income or family composition." Id. §§ 7-12(B)(1)-(3).

Once a landlord has completed the interim recertification requested by the tenant or as a result of the tenant's mandatory reporting of increased income of family composition changes, any increase in rent will become effective on the first day of the month following the landlord's delivery of a thirty day notice to the tenant of the increase. Id. § 7-13(C)(1). If the tenant is entitled to a decrease, "the change in rent is effective on the first day of the month after the date of action that caused the interim certification, e.g., <u>first of the month after the date of loss of employment</u>. A 30-day notice is not required for rent decreases." Id. § 7-13(C)(2) (emphasis added).

However, the effective date is different if the tenant did not comply with the mandatory reporting requirements related to an increased income or change in family composition, <u>see</u> <u>id.</u> § 7-10(A), or if the landlord discovers any other change that would have warranted an interim recertification without the tenant reporting it or requesting the interim recertification. Under those circumstances, any increase is effective "retroactive to the first of the month following the date that the action occurred." Id. § 7-13(D)(1). Any decrease in rent "must be implemented effective the first rent period <u>following completion of the recertification</u>." Id. § 7-13(D)(2) (emphasis added).

The requirements for conducting annual and interim recertifications were incorporated into defendant's lease with plaintiff. Section 15 of the lease advised that annual recertifications will begin around the first of August. Section 16 contained defendant's obligation to report increases in income and warned that a failure to report may increase rent to the HUD approved market rent. And, under Section 18, defendant was obligated to pay the difference between his rent and the market rent where he to provided false information or "fail[ed] to report interim changes in family income or other factors as required by [Section] 16." However, Section 16(b) made "optional" reporting a decrease in income and provided that "[u]pon verification Landlord will make appropriate rent reduction" unless the reduction is temporary and if there is a delay in the rectification to determine if the reduction is temporary, but it turns out it is not, "the rent reduction will be retroactive."

The HUD Handbook, therefore, as well as the subject lease, make the reporting of income reduction optional to the tenant. Specifically, under Section 7-10(B), "[t]enants may request an interim recertification," and in the lease it states a "tenant may report any decrease in income." There are no express deadlines for reporting such decreases.

Applying the controlling regulations and the lease provisions that are derived from them, we first observe that there is no obligation imposed on a tenant to seek an interim recertification when he or she experiences a reduction in income. Both make it clear that the pursuit of that process is left to the tenant's discretion, and when it is pursued, any rent reduction based upon information provided by the tenant that is verified by the landlord is effective the first of the month after the event that caused the interim recertification. Under the regulations and defendant's lease, it is only when the tenant has an obligation to report, such as for an increase in income, that the tenant faces dire consequence for a failure to do so. Where he or she does not report in that situation, the increased rent's effective date is the first day of the month after the increased income occurred. Likewise, when there is no request for an interim recertification and the landlord otherwise discovers the tenant's changed financial information, the rent decrease becomes effective on the first of the month after recertification based on the new information.

Here, there is no dispute that defendant did not request an interim recertification until September 2019 when he already allegedly was in arrears in the lease's rent. At that time, which was still during the lease's term, Bruce conducted an interim and annual recertification based upon information supplied

by defendant, sent his information to the occupancy specialist, and his rent amount was reduced.

Under these facts, and considering the dual purposes of the regulation to align a participating tenant's rent to his or her income while making sure only those who are entitled to subsidies receive them, we conclude the trial court erred by determining that the effective date was October 1, 2019, for the decrease to which defendant was entitled after he ceased employment. As the regulations clearly state, under these circumstances the effective date must be the first day of the month following the event that caused the interim recertification. That event would be defendant losing his employment in February 2019, as the trial court found.

We are not persuaded otherwise by plaintiff's contention that, under our holding here, tenants could wait an inordinate amount of time, even longer than the seven months here that defendant allowed to lapse before rereporting his decreased income. That, according to plaintiff, would be an untenable result.[6] We disagree, if as here, a tenant's reporting of a decrease is within his lease's

---

[6] We note that plaintiff does not cite to any case law from this or any other jurisdiction to support its contention that a delay in reporting a reduction in income compels a decrease in rent effective only on the first of the month after reporting. Instead, plaintiff relies on its own interpretation of the regulations with which we disagree.

A-2027-19

term and still within months of the event that caused the reduction in income, especially where, as here, there was no demonstration of any prejudice or harm to the landlord. Under these circumstances, we see nothing untenable about fulfilling a "key requirement" of the program and applying the reduction to the effective date as contemplated by the regulations in order to keep defendant's rent aligned with his income.

We therefore reverse the trial court's holding and remand for a determination as to whether, applying the correct effective date, there was any rent due and owing to plaintiff. If so, the judgment of possession must be amended to reflect the correct amount. If not, the judgment must be vacated.

Reversed and remanded for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION