Essex County Court of Common Pleas.

STATE OF NEW JERSEY, COMPLAINANT, v. NATELSON BROTHERS, TRADING AS COLYER & COMPANY, DEFENDANT.

Decided June 14, 1943.

For the Newark Defense Council, *Sidney R. Pine.*

For Leonard Dreyfuss, Civilian Defense Director, *Benjamin C. Van Tine (Milton M. Unger,* of counsel).

For the defendant, *Samuel Ribner.*

VAN RIPER, C. P. J. The defendant was found guilty in the Police Court of the City of Newark on a complaint charging it with violating Rule and Regulation 22 promulgated by the Governor of the State of New Jersey by virtue of the authority conferred upon him by section 13 of chapter 251 of the laws of 1942, *N. J. S. A. App.A* :9–45.

The appeal resulted in a trial *de novo* before this court, and the defendant moved for a dismissal, basing its motion on the following points:

(1) That a corporation defendant may not be held as a disorderly person within the meaning of section 13, chapter 251 of the laws of 1942.

I think it is fundamental that where the legislature passes an act making it illegal for a "person" to do a certain thing, that "person" refers to a corporate identity as well as a natural person unless there is a specific exemption by the wording of the statute which indicates clearly that it is intended not to cover a corporate identity. The characterization and use of the word "person" is sufficient to include both.

(2) That the return of the magistrate fails to show that the defendant was adjudged a disorderly person as is required by section 17, chapter 251 of the laws of 1942, *N. J. S. A. App.A* :9–49.

An examination of the return made by the judge of the Police Court easily satisfies me that the return is proper and in accordance with the provision of the statute.

(3) That the rule-making power conferred upon the Governor by section 13, chapter 251 of the laws of 1942 is an illegal delegation of legislative power.

This point is directed to a most important phase of our form of government and therefore is worthy of full discussion, particularly in view of the fact that the question of the power of the Governor to promulgate certain rules and regulations by virtue of authority conferred upon him by the last-mentioned statute has not yet been passed upon by the courts of this state.

The act in question, chapter 251 of the laws of 1942, *N. J. S. A. App.A* :9–33 *et seq.,* was, as is set forth in section 1 thereof, a war time measure, enacted shortly after this country entered the present conflict, and as indicated by that section, its fundamental purpose was to provide the governmental authorities of the state in war time with the power to use the police power of the state for the protection of the health and safety of all the people of the state.

It was of course necessary in order to do this for the legislature to provide a comprehensive plan and method whereby the various agencies of the state and of the subdivisions thereof could best utilize the power and resources which they possessed in the public interest, that interest being fundamentally the protection of our people against attack and the preservation of our safety and health.

The act in question is comprehensive in nature and provides for the creation of a civilian defense organization, and goes into detail in describing many of the problems which it is contemplated will have to be dealt with, and provides further for the setting up of certain governmental agencies, both by and under the civilian defense director and under the Governor of the state.

Section 13 of the act provides that:

"In order to accomplish the purposes of this act, the Governor is empowered to make such orders, rules and regulations as may be necessary adequately to meet the various problems presented by the said war emergency and from time to time to amend or rescind such orders, rules and regulations, including among others the following subjects:

"A. On matters pertaining to the method of conducting black-outs, partial black-outs, and modifying and controlling illumination * * *."

There follows then a detailed series of subjects over which and concerning which the Governor is given express authority to promulgate his rules and regulations, but we are concerned here only with that which refers to the method of conducting black-outs and controlling illumination.

We are now confronted with the question of whether or not, as contended by the defendant, this grant of power to the Governor is such an unlimited grant of legislative power as to make it a violation of our constitutional provision, or whether or not it is merely clothing the Governor with the authority to perform an added executive function.

The defendant relies almost entirely upon the cited cases of *Panama Refining Co.* v. *Ryan,* 293 *U. S.* 388; 55 *S. Ct.* 241, and *Schechter Poultry Corp.* v. *United States,* 295 *U. S.* 495; 55 *S. Ct.* 837, both of which were decided by the Supreme Court of the United States, and in both of which cases the court held that the grant of power to the President by the Congress was of such a broad and unlimited legislative nature that it was a clear violation of the constitutional provision and was therefore unconstitutional. Although of course it does not change the provision of the constitution here questioned, it is worthy of note in passing that the

grants referred to in the above-mentioned cases were not the result of any war emergency legislation which attempted to confer upon the President the power to protect the nation against the assaults and emergencies of war.

In the *Panama Refining Co.* case the court said (293 *U. S.* 388; 55 *S. Ct.* 246): "We look to the statute to see whether the Congress has declared a policy with respect to that subject; whether the Congress has set up a standard for the President's action; whether the Congress has required any finding by the President in the exercise of the authority to enact the prohibition." And further: "Section 9 (c) does not state whether or in what circumstances or under what conditions the President is to prohibit * * *." And also: "It establishes no criterion to govern the President's course. It does not require any finding by the President as a condition of his action." And again: "So far as this section is concerned, it gives to the President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit." The court then said: "The effort by ingenious and diligent construction to supply a criterion still permits such a breadth of authorized action as essentially to commit to the President the functions of a legislature rather than those of an executive or administrative officer executing a declared legislative policy." And again in the *Schechter* case, above referred to, there is the same question raised by the court as to whether or not the Congress by enactment of the statute in question actually declared a policy and left to the President only the administrative function of carrying it out, or whether it gave to the President broad and unlimited legislative powers to prohibit or not to prohibit a certain thing as he saw fit.

I think that chapter 251 of the laws of 1942 does not come within the category of the federal statute referred to in the last above mentioned cases. It is clear from a reading of the statute that the legislature defined a policy. That policy, in so far as it pertains to the act of the defendant in question here, was that the state should prescribe the method of conducting a black-out, and that the state should control illumination during black-outs. The fact that section 13

gives to the Governor power to make regulations concerning these things amounts in itself to a declaration of policy that those particular subjects were matters which should come within the control of the state, and it follows that if illumination is to be controlled then there must be an administrative method devising that control and saying what it should be.

To contend that the state was without power to use its resources and its police powers to protect its people in time of war from a threatened invasion, or to assist them in preparing to defend themselves and train themselves to resist in case of invasion, would be to say that the state as an instrumentality of protection for its citizens had ceased to exist. And to further say that in order to provide this protection for the people the legislature must by legislative enactment define every detail and prescribe every administrative function would be to produce another absurdity.

We must take judicial notice of the fact that the acts of war are as unpredictable and uncertain as the future unknown acts of God; and therefore if the people are to be protected against them or be trained to meet them, the power of prescribing the conditions under which they are to be met must be so flexible as to permit them to be changed or regulated upon practically a moment's notice. ' The person entrusted with the regulating of these administrative functions, in this case the Governor of the State, must, if he is to be effective, be clothed with authority to act as situations occur from time to time. Otherwise the policy of the legislature, namely, to provide the people of the state with every possible protection, becomes a nullity.

Unlike the federal statute above referred to, where the court held that the Congress had not declared a policy, the legislature of our state has declared a policy. Part of that policy is, as prescribed in section 1 of the act, "to aid in the prevention of damage to and the destruction of property during the present war emergency by prescribing a course of conduct for the civilian population of this state during such war emergency and by centralizing control of all civilian activities having to do with the war emergency under the

Governor." It will be seen that by this act it was the declared policy of the legislature to make the Governor commander-in-chief of civilian activities having to do with the war emergency. Having made him commander-in-chief, they must of necessity clothe him with the authority to issue orders and to prescribe the method whereby the plan of training of the civilian population for the defense of the people of the state could be carried out.

I am satisfied that the legislature declared a definite policy, and that they did not delegate to the Governor legislative authority, but rather having made him commander-in-chief of civilian activities, in addition to the military activities of the state, which power he already possesses by virtue of his office, they merely placed in his hands the duty and the responsibility of administering that policy, and said that he should administer it by virtue of regulations which were to be prescribed by him and published in accordance with the terms of the act.

The power which was delegated to the Governor was not unlimited. How many things he might be able to do, or how many subjects concerning which he might be justified in making regulations, it is not necessary to decide here. The fact is that the regulation which he made and which is in question here was one concerning black-outs and controlling illumination, which the legislature specifically said should be the subject-matter of a Governor's regulation.

Herein the statute differs from the federal statute, and we are able to differentiate from the *Panama Refining Co.* case where the test seemed to be, as Mr. Justice Cardozo said, whether or not the legislation was "canalized within the banks that keep it from overflowing." This language, in the words of one who is not anxious to invite further litigation in order to determine what might be said here, means that the test is whether or not the authority granted to the executive is unlimited, or whether or not it is confined and directed to specific subjects. It seems clear that in the statute which we are interpreting here the authority is specific and permits the Governor to act only in certain prescribed instances.

The decisions of the Supreme Court of the United States upon which the defendant relies were with reference to legislation enacted in the early days of the New Deal when the Congress was willing apparently to legislate away all authority almost without reservation. As was said in the *Schechter* case, it amounted to "delegation of authority running riot." (295 *U. S.* 495; 55 *S. Ct.* 853.) No such construction can be placed upon the statute in question here. The legislature did not abdicate; it merely appointed an administrative officer to carry out its policies.

I am satisfied that chapter 251 of the laws of 1942 clearly prescribes a legislative policy with reference to the subject-matter of black-outs and controlled illumination, and that Regulation 22, the one here complained of, was a proper exercise of an administrative function by the Governor in furtherance of a constitutional grant by the legislature to the Governor of an administrative function, and that neither the statute itself nor the regulation referred to in any way conflicts with the constitutional prohibition against the grant of legislative power, and therefore both the statute and the regulation being valid, and the facts upon the trial of this case justifying the conclusion that the defendant violated the regulation in question, a verdict of guilty is hereby rendered and a fine imposed in the sum of $175.