NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0639-20

JWC FITNESS, LLC,

       Plaintiff-Appellant,

v.

PHILIP D. MURPHY, in his
official capacity as the Governor
of the State of New Jersey,

       Defendant-Respondent.

_____

<div style="border:1px solid black; display:inline-block; padding:8px;">

**APPROVED FOR PUBLICATION**

**October 18, 2021**

**APPELLATE DIVISION**

</div>

Argued September 13, 2021 – Decided October 18, 2021

Before Judges Rothstadt, Mayer, and Natali.

On appeal from the Superior Court of New Jersey, Law
Division, Sussex County, Docket No. L-0388-20.

Catherine M. Brown argued the cause for appellant
(Catherine M. Brown and Stern Kilcullen & Rufolo,
LLC, attorneys; Catherine M. Brown and Robert W.
Ferguson, of counsel and on the briefs).

Alec Schierenbeck, Deputy State Solicitor, argued the
cause for respondent (Andrew J. Bruck, Acting
Attorney General, attorney; Alec Schierenbeck and
Melissa H. Raksa, Assistant Attorney General, of
counsel; Jeremy M. Feigenbaum, State Solicitor, and
Kevin R. Jespersen, Assistant Attorney General, of
counsel and on the briefs; Amy E. Stevens and Kai W.

Marshall-Otto, Deputy Attorneys General, on the briefs).

The opinion of the court was delivered by

ROTHSTADT, J.A.D.

In this latest appeal arising from executive orders (EOs) issued by the Governor of New Jersey, defendant Philip D. Murphy, in response to health-related emergencies caused by the spread of the COVID-19 coronavirus, plaintiff JWC Fitness, LLC, which until October 2020 operated a kickboxing business in Franklin, claims entitlement to compensation under the New Jersey Civil Defense and Disaster Control Act (Disaster Control Act), N.J.S.A. App. A:9-30 to -63, for the closure and limitations placed on its business under some EOs.[1]

---

[1] Initially, plaintiff filed a complaint with the Law Division asserting claims for compensation. The Law Division transferred the matter to us as an appeal from a State officer's actions under Rule 2:2-3(a)(2) ("[A]ppeals may be taken to the Appellate Division as of right . . . to review final decisions or actions of any state administrative agency or officer, and to review the validity of any rule promulgated by such agency or officer . . . ."). See Prado v. State, 186 N.J. 413, 422-23 (2006) (holding that Appellate Division had jurisdiction over appeal from Attorney General ruling); Pressler & Verniero, Current N.J. Court Rules, cmt. 3.2.1 on R. 2:2-3 (2022). The rule applies to challenges to executive orders issued by the Governor, regardless of whether the challenges are constitutional in nature. Commc'ns Workers of Am. AFL-CIO v. Christie, 413 N.J. Super. 229, 252-53 (App. Div. 2010); Perth Amboy Bd. of Educ. v. Christie, 413 N.J. Super. 590, 597 n.5 (App. Div. 2010); Bullet Hole, Inc. v. Dunbar, 335 N.J.

More specifically, plaintiff contends that through the EOs that temporarily limited and shut down the operations of health clubs, including gyms and fitness centers, the State effectively "commandeered and utilized" its property under N.J.S.A. App. A:9-34, such that the State must establish an "emergency compensation board" under N.J.S.A. App. A:9-51(c), in order to provide "payment of the reasonable value of such . . . privately owned property." N.J.S.A. App. A:9-34. Plaintiff also seeks a declaratory judgment that the EOs effectuated a taking of its property without just compensation, in violation of the New Jersey Constitution, art. I, ¶ 20, and the United States Constitution, amends. V and XIV.

We conclude that plaintiff's arguments are without merit as the statutory standard for compensation has not been implicated, and the EOs did not effectuate a taking of plaintiff's property within the meaning of the state and federal constitutions.

In its claim for compensation, plaintiff cites to EOs 104 and 107, which the Governor issued in March 2020, shortly after he first declared a public health

---

Super. 562, 571-72 (App. Div. 2000); Pressler & Verniero, cmt. 3.4.2(a) on R. 2:2-3.

emergency.[2]  In EO 104, which the Governor issued on March 16, 2020, he directed, among other things, that gyms and fitness centers be closed to the public.  Exec. Order No. 104 (Mar. 16, 2020), 52 N.J.R. 550(a) (Apr. 6, 2020).  Five days later, in EO 107, he superseded EO 104, but maintained the closure of gyms and fitness centers.  Exec. Order No. 107 (Mar. 21, 2020), 52 N.J.R. 554(a) (Apr. 6, 2020).

---

[2]  On March 9, 2020, the Governor declared a public health emergency and state of emergency, invoking the authorities granted to him under the State Constitution and various State statutes, including the Emergency Health Powers Act, N.J.S.A. 26:13-1 to -31, and the Disaster Control Act.  Exec. Order No. 103 (Mar. 9, 2020), 52 N.J.R. 549(a) (Apr. 6, 2020).

Through May 2021, the Governor continued to declare that the public health emergency continued to exist in the State, and ordered and directed that all COVID-19 EOs remain in full force and effect.  See Exec. Order No. 119 (Apr. 7, 2020), 52 N.J.R. 956(a) (May 4, 2020); Exec. Order No. 138 (May 6, 2020), 52 N.J.R. 1107(b) (June 1, 2020); Exec. Order No. 151 (June 4, 2020), 52 N.J.R. 1300(a) (July 6, 2020); Exec. Order No. 162 (July 2, 2020), 52 N.J.R. 1475(a) (Aug. 3, 2020); Exec. Order No. 171 (Aug. 1, 2020), 52 N.J.R. 1634(a) (Sept. 8, 2020); Exec. Order No. 180 (Aug. 27, 2020), 52 N.J.R. 1711(a) (Sept. 21, 2020); Exec. Order No. 186 (Sept. 25, 2020), 52 N.J.R. 1880(a) (Oct. 19, 2020); Exec. Order No. 191 (Oct. 24, 2020), 52 N.J.R. 2034(a) (Nov. 16, 2020); Exec. Order No. 200 (Nov. 22, 2020), 52 N.J.R. 2157(a) (Dec. 21, 2020); Exec. Order No. 210 (Dec. 21, 2020), 53 N.J.R. 98(b) (Jan. 19, 2021); Exec. Order No. 215 (Jan. 19, 2021), 53 N.J.R. 192(a) (Feb. 16, 2021); Exec. Order No. 222 (Feb. 17, 2021), 53 N.J.R. 398(a) (Mar. 15, 2021); Exec. Order No. 231 (Mar. 17, 2021), 53 N.J.R. 579(a) (Apr. 19, 2021); Exec. Order No. 235 (Apr. 15, 2021), 53 N.J.R. 761(a) (May 17, 2021); Exec. Order No. 240 (May 14, 2021), 53 N.J.R. 1041(a) (June 21, 2021).

The closure mandate was temporary, however. Throughout the spring and summer of 2020, as the State's first wave of COVID-19 infections waned, the Governor issued EOs that permitted the reopening of many previously closed facilities and businesses, subject to limitations that were intended to mitigate the spread of COVID-19, including capacity limitations and mandates for social distancing, mask-wearing, and sanitization.[3]

As it relates to this appeal, on June 26, 2020, the Governor permitted gyms and fitness centers to open their outdoor spaces to the public and also to offer individualized instruction indoors. Exec. Order No. 157 (June 26, 2020), 52 N.J.R. 1455(a) (Aug. 3, 2020). The Governor explained that "indoor environments present[ed] increased risks of transmission as compared to outdoor environments." Ibid. In addition:

> [I]ndoor gyms, sports facilities, and fitness centers present particularly high risks of COVID-19 transmission, where people are congregating in a confined indoor space and working out, which entails sustained physical activity resulting in heavy breathing and exhalations that can increase the risk of COVID-19 spread, and where exercise equipment is shared by many different people over the course of the day, creating an additional danger of COVID-19 spread, and there are a high number of outdoor recreation

---

[3] See State of New Jersey, Executive Orders, https://nj.gov/infobank/eo/056murphy/ (last visited Sept. 29, 2021).

> opportunities to ensure that members of the public can engage in a wide range of exercise and fitness . . . .

> [Ibid.]

Two months later, the Governor issued EO 181, permitting gyms and fitness centers to reopen their indoor premises effective September 1, 2020, subject to a twenty-five percent capacity limitation, as well as additional measures to mitigate the risk of COVID-19 transmission. Exec. Order No. 181 (Aug. 27, 2020), 52 N.J.R. 1712(a) (Sept. 21, 2020). Five months later, on February 3, 2021 (after plaintiff permanently closed its business), the Governor raised the indoor capacity limit for gyms and fitness centers to thirty-five percent. Exec. Order No. 219 (Feb. 3, 2021), 53 N.J.R. 288(a) (Mar. 1, 2021). And, on March 11, 2021, he increased the indoor capacity limit for such businesses to fifty percent. Exec. Order No. 230 (Mar. 11, 2021), 53 N.J.R. 576(a) (Apr. 19, 2021).

On May 14, 2021, the Governor eliminated percentage-based capacity limitations previously placed upon gyms and fitness centers but ordered that such businesses "shall limit occupancy to a number that ensures that all patrons or groups of patrons entering the facility together can remain six feet apart." Exec. Order No. 239 (May 14, 2021), 53 N.J.R. 970(a) (June 7, 2021). Ten days later, the Governor issued EO 242, in which he permitted businesses, including

6

gyms and fitness centers, to operate at full capacity, with no need for maintaining a six-foot distance between patrons, and also eliminated the requirement that individuals wear masks while in indoor public spaces. Exec. Order No. 242 (May 24, 2021), 53 N.J.R. 1044(a) (June 21, 2021).

Finally, on June 4, 2021, the Governor declared an end to the public health emergency under the Emergency Health Powers Act, N.J.S.A. 26:13-1 to -31, (EHPA) but continued his declaration of a state of emergency under the Disaster Control Act. Exec. Order No. 244 (June 4, 2021), 53 N.J.R. 1131(a) (July 6, 2021). The same day, the Governor signed into law a bill passed by the Legislature providing that all EOs "issued by the Governor prior to the effective date of this act, . . . that relied on the existence of the public health emergency declared by the Governor in Executive Order No. 103 of 2020, as extended, shall expire 30 days following the effective date of this act," with the exception of certain enumerated EOs, none of which are relevant to this appeal. L. 2021, c. 103. The Legislature also affirmed the Governor's continuation of a state of emergency under the Disaster Control Act. Ibid.

Before the Governor declared a health emergency in 2020, plaintiff offered thirty instructor-led kickboxing classes per week, with a maximum class size of thirty. It had more than 200 members who paid either on a monthly basis,

A-0639-20

or prepaid for specified periods of time, with all members entitled to attend as many classes as they wished. It also offered a small gym area and personal training; however, these services constituted an insubstantial component of the business.

On March 16, 2020, plaintiff shut its doors in compliance with EO 104 and, in April, it suspended automatic membership payments, and those members who prepaid for specified periods of time no longer had the benefit of attending unlimited in-person classes. However, in the immediate aftermath of the shutdown, plaintiff offered live-stream classes to its members, without charge. It also offered free classes to local schools as a gym class option.

Consistent with EO 157, in the summer of 2020 plaintiff began offering outdoor classes, which were shorter and less intense than its indoor classes had been. It charged $10 per class, with a maximum of eighteen participants; however, the capacity limit was never reached.

Later, after the Governor issued EO 181, which permitted plaintiff to open its indoor operations effective September 1, 2020, plaintiff did not do so until October 12, 2020. At the twenty-five percent capacity limit permitted by the EO, and subject to Department of Health (DOH) regulations, plaintiff's maximum indoor class size was limited to nine. In practice, however, the class

8

size averaged four-to-five members. Moreover, with the twenty-five percent capacity limit, plaintiff could not resume its business model of offering unlimited classes for a flat monthly fee. Instead, it charged $10 per class, and offered ten indoor classes per week.

Plaintiff hoped to eventually reopen at full capacity. However, on September 14, 2020, plaintiff's landlord commenced eviction proceedings due to plaintiff's non-payment of rent. At that time, after considering the deficit between its revenue and expenses, plaintiff determined to close permanently effective October 31, 2020.

There is no question that plaintiff's business generated little revenue after March 2020. However, it received $21,650 in grants from the federal government (of which $16,650 was used to pay employee salaries and rent), as well as a grant of $1,000 from the State. In addition, plaintiff's principal received unemployment benefits that were enhanced pursuant to federal legislation.

On appeal, citing the Disaster Control Act, plaintiff contends it is entitled to compensation for its losses caused by the limitations the EOs placed on its business and for its eventual closure. Plaintiff specially relies upon N.J.S.A. App. A:9-34. It contends the Governor exercised his power under that section

A-0639-20

of the Disaster Control Act to "commandeer and utilize" plaintiff's property by means of the EOs that shut or limited its operations. It also contends it is entitled to compensation under the taking clauses of the federal and state constitutions. U.S. Const. amends. V, XIV; N.J. Const. art. I, ¶ 20. We reject both contentions.

Whether plaintiff is entitled to compensation under the Disaster Control Act presents a question of statutory interpretation, which is an issue of law. State v. Rodriguez, 238 N.J. 105, 113 (2019); Am. Fire & Cas. Co. v. N.J. Div. of Tax'n, 189 N.J. 65, 79 (2006). The goal of statutory interpretation is to ascertain and effectuate the Legislature's intent. Rozenblit v. Lyles, 245 N.J. 105, 121 (2021); Nicholas v. Mynster, 213 N.J. 463, 480 (2013). To that end, we first consider the statutory language. Rozenblit, 245 N.J. at 121-22. Where words are not given specified meanings within the statute, we afford those words their ordinary meanings, viewed in context of the legislation as a whole. N.J.S.A. 1:1-1; Rozenblit, 245 N.J. at 122; Nicholas, 213 N.J. at 480; DiProspero v. Penn, 183 N.J. 477, 492 (2005). "In this way, we must construe the statute sensibly and consistent with the objectives that the Legislature sought to achieve." Nicholas, 213 N.J. at 480.

If the statute's plain language reveals the Legislature's intent, we do not consider extrinsic evidence, such as legislative history. Ibid. Extrinsic evidence

A-0639-20

should be considered only where the statutory language is ambiguous, or if a plain reading of the statute would lead to an absurd result.  Rozenblit, 245 N.J. at 122; Nicholas, 213 N.J. at 480; DiProspero, 183 N.J. at 492-93.  We should "not adopt an interpretation of the statutory language that leads to an absurd result or one that is distinctly at odds with the public-policy objectives of a statutory scheme."  State v. Morrison, 227 N.J. 295, 308 (2016).  Accord Cowley v. Virtual Health Sys., 242 N.J. 1, 15 (2020).  Finally, when reviewing separate but related statutes, we seek to harmonize the statutes in order to effectuate the Legislature's intent.  N.J. Transit Corp. v. Sanchez, 242 N.J. 78, 86 (2020); Nw. Bergen Cnty. Utils. Auth. v. Donovan, 226 N.J. 432, 444 (2016); Am. Fire & Cas. Co., 189 N.J. at 79-80.

The purpose of the Disaster Control Act

> is to provide for the health, safety and welfare of the people of the State of New Jersey and to aid in the prevention of damage to and the destruction of property during any emergency as herein defined by prescribing a course of conduct for the civilian population of this State during such emergency and by centralizing control of all civilian activities having to do with such emergency under the Governor and for that purpose to give to the Governor control over such resources of the State Government and of each and every political subdivision thereof as may be necessary to cope with any condition that shall arise out of such emergency and to invest the Governor with all other power convenient or necessary to effectuate such purpose.

A-0639-20

[N.J.S.A. App. A:9-33.]

See also Cnty. of Gloucester v. State, 132 N.J. 141, 144-45 (1993) (discussing Disaster Control Act); Worthington v. Fauver, 88 N.J. 183, 192-95 (1982) (same); State v. Natelson Bros., 21 N.J. Misc. 186, 187-92 (Cnty. Ct. 1943) (same).

The Act defines an "emergency" as including a "disaster." N.J.S.A. App. A:9-33.1(4). And it defines a "disaster" as

> any unusual incident resulting from natural or unnatural causes which endangers the health, safety or resources of the residents of one or more municipalities of the State, and which is or may become too large in scope or unusual in type to be handled in its entirety by regular municipal operating services.
>
> [N.J.S.A. App. A:9-33.1(1).][4]

In its entirety, N.J.S.A. App. A:9-34 provides:

> The Governor is authorized to utilize and employ all the available resources of the State Government and of each and every political subdivision of this State, whether of men, properties or instrumentalities, and to commandeer and utilize any personal services and any privately owned property necessary to avoid or protect against any emergency subject to the future payment of

___

[4] A related statute, the EHPA, defines a "public health emergency" as including "the appearance of a novel . . . biological agent," with "biological agent" defined as including a "virus . . . capable of causing death, disease, or other biological malfunction in a human." N.J.S.A. 26:13-2.

> the reasonable value of such services and privately
> owned property as hereinafter in this act provided.
> [N.J.S.A. App. A:9-34 (emphasis added).][5]

The terms "commandeer" and "utilize" are not defined in the Disaster Control Act.[6] However, the common meanings of the word "commandeer" are: "to compel to perform military service"; "to seize for military purposes"; or "to take arbitrary or forcible possession of." See Commandeer, Merriam-Webster, https://www.merriam-webster.com/dictionary/commandeer (last visited Sept. 24, 2021). As for the third of these meanings, Merriam-Webster provides the following example: "The city commandeered 60 acres of the property by eminent domain for a new high school." Ibid. Thus, to "commandeer" property entails seizing the property or taking possession of it akin to a physical taking under the constitution.[7]

---

[5] It has been held that the Governor's exercise of power under N.J.S.A. App. A:9-34 does not mandate compensation for the State's utilization of County property. Shapiro v. Fauver, 193 N.J. Super. 237, 240-41 (App. Div. 1984). See also Cnty. of Gloucester, 132 N.J. at 152 (agreeing with reasoning of Shapiro on issue of reimbursement to counties).

[6] The word "commandeer" is unique to the Disaster Control Act. Other than the Disaster Control Act, there does not appear to be any other reference to the word "commandeer" within the entire text of the New Jersey statutes.

[7] See also Funk & Wagnalls New Comprehensive International Dictionary of the English Language 262 (1978) (defining "commandeer" as: "[t]o force into

As for the word "utilize," it commonly means "to make use of: turn to practical use or account." See Utilize, Merriam-Webster, https://www.merriam-webster.com/ dictionary/utilize (last visited Sept. 27, 2021). Thus, to "utilize" property also anticipates a physical taking of property for public use, as with a physical taking under the constitution.

Also notably, in N.J.S.A. App. A:9-34, the words "commandeer" and "utilize" are joined with the word "and." Accordingly, in the context in which the words are used, the most reasonable understanding of the statute is that it authorizes the government to seize private property or take possession of it akin to a physical taking under the constitution, i.e., to "commander" the property, and thereafter "utilize" the property for the governmental purpose of avoiding or protecting against an emergency.

These definitions also make sense when the terms are considered in the context of other provisions of the Disaster Control Act. For example, the Act also permits the Governor

> [t]emporarily to employ, take or use the personal services, or real or personal property, of any citizen or resident of this State, or of any firm, partnership or unincorporated association doing business or domiciled

---

military service," "[t]o take possession of or requisition by force for public use, especially under military necessity; sequester; confiscate," or "[t]o take over by force or by threat of force").

14                                                          A-0639-20

in this State, or <u>of any corporation incorporated in or doing business in this State</u>, or the real property of any nonresident located in this State, <u>for the purpose of securing the defense of the State or of protecting or promoting the public health, safety or welfare</u>; provided, that such personal services or property shall not be employed or used beyond the borders of this State unless otherwise authorized by law.

[N.J.S.A. App. A:9-51(a)(3) (emphasis added).]

This language similarly authorizes the government's physical taking and utilization of private property in order to respond to an emergency.

However, the Disaster Control Act provides the Governor with substantial powers in addition to the power to "commandeer and utilize," N.J.S.A. App. A:9-34, or "temporarily . . . employ, take or use" private property. N.J.S.A. App. A:9-51(a)(3). <u>See</u> N.J.S.A. App. A:9-30, 9-33, 9-35(b), 9-36, 9-40, 9-45, 9-51, 9-59. <u>See also</u> <u>Worthington</u>, 88 N.J. at 192-94, 198-99, 205-09 (addressing extent of the Governor's powers under Disaster Control Act).

As particularly relates to this appeal, the Disaster Control Act also empowers the Governor to

make such orders, rules and regulations as may be necessary adequately to meet the various problems presented by any emergency and from time to time to amend or rescind such orders, rules and regulations, including among others the following subjects:

. . . .

15

e. The conduct of the civilian population during the threat of and imminence of danger or any emergency.

. . . .

i. On any matter that may be necessary to protect the health, safety and welfare of the people . . . .

j. Such other matters whatsoever as are or may become necessary in the fair, impartial, stringent and comprehensive administration of this act.

All such orders, rules and regulations when established shall be forthwith promulgated by proclamation of the Governor, which promulgation shall be deemed to be sufficient notice to the public.

[N.J.S.A. App. A:9-45.]

Similarly, under N.J.S.A. App. A:9-40: "The Governor is authorized to make, amend and rescind orders, rules and regulations as in this act provided . . . ." And, anyone who is found to have violated any order, rule, or regulation adopted by the Governor pursuant to the Disaster Control Act shall be adjudged a disorderly person and be subject to fine or imprisonment. N.J.S.A. App. A:9-49(h) and (i). See also N.J.S.A. App. A:9-50 ("Any person who shall knowingly aid or abet another in the violation of any provision of this act shall also be adjudged a disorderly person and punishable in the same manner as the violation aided or abetted.").

16

The Disaster Control Act does not provide for any compensation in connection with orders, rules, and regulations promulgated by the Governor pursuant to N.J.S.A. App. A:9-40 or App. A:9-45. However, the Act explicitly provides for compensation to be paid to any person for personal services temporarily employed, taken, or used under N.J.S.A. App. A:9-51(a), stating that such compensation "shall be paid at the prevailing established rate for services of a like or similar nature." N.J.S.A. App. A:9-51(b). And the Act provides procedures by which a petitioner may pursue a claim for compensation. N.J.S.A. App. A:9-51(c) to (e).

Additionally, the Act explicitly provides for the establishment of emergency compensation boards in and for each county of the State, which "shall award reasonable compensation to the party entitled thereto <u>for any property employed, taken or used under the provision of this subsection</u> and for any injury caused by such employment, taking or using." N.J.S.A. App. A:9-51(c) (emphasis added).

A comparable distinction exists within the Disaster Control Act with respect to the compensation obligation imposed upon municipalities. Specifically, the Disaster Control Act provides that municipalities acting under the Act may be obligated to pay "just compensation to the extent that such

property shall have been taken by the municipality." N.J.S.A. App. A:9-51.7. However: "No compensation shall be granted to any individual to the extent that the action of the municipality does not amount to a taking of property but to a reasonable regulation of property pursuant to a proper exercise of the police power." Ibid.

Considering the Disaster Control Act as a whole, it anticipates that private property owners will receive just compensation when the State or a municipal government physically takes, commandeers, and utilizes property, for the governmental purpose of securing the defense of the State or of protecting or promoting the public health, safety, or welfare in the context of a declared emergency, akin to a physical taking under the constitution. U.S. Const. amends. V, XIV; N.J. Const. art. I, ¶ 20. Even when an EO issued under the Act required property belonging to a County government to be put to State use, provisions for compensation were included. See Worthington, 88 N.J. at 188, 191 (upholding an EO that required county jails to temporarily house state prisoners where the EO called for the establishment of a "program to compensate the counties holding state prisoner"). However, the Act does not anticipate that the State will be obligated to pay compensation when it merely exercises its

police powers to regulate the use of property in the context of a declared emergency.

This interpretation of the Disaster Control Act is also supported when the Act is considered in the context of a related statute, the EHPA. Notably, the compensation provisions of the EHPA are expressly meant to be read in conjunction with those of the Disaster Control Act, as follows:

> Upon the declaration of an emergency by the Governor pursuant to [the Disaster Control Act] which supersedes the declaration of a public health emergency, the person shall proceed in accordance with the provisions of [the Disaster Control Act] and the person's rights, remedies and entitlement to reimbursement shall be limited to that which is afforded in that act.
>
> [N.J.S.A. 26:13-25(d).]

See also Senate Health, Hum. Servs. and Senior Citizens Comm. Statement to First Reprint of S. 2085 (Feb. 28, 2005) ("The provisions governing the board and reimbursement for services are modeled after the Disaster Control Act ([N.J.S.A. App. A:9-30 to -63]) that governs declarations of emergencies by the Governor."), https://njleg.state.nj.us/2004/Bills/S2500/2085_S2.PDF (last visited Sept. 24, 2021).

The EHPA explicitly authorizes reasonable compensation to be paid for the physical taking, destruction, or utilization of private property. N.J.S.A.

26:13-8(b); N.J.S.A. 26:13-9(a) and (b); N.J.S.A. 26:13-10(c); N.J.S.A. 26:13-24; N.J.S.A. 26:13-25. However, the EHPA does not authorize compensation relating to the mere regulation of individuals and private property during a public health emergency, including provisions of the EHPA that empowered the Governor to close and limit plaintiff's business. N.J.S.A. 26:13-9(d) (authorizing restricting of movement of persons); N.J.S.A. 26:13-12 (authorizing "all reasonable and necessary measures to prevent the transmission of infectious disease"); N.J.S.A. 26:13-27 (authorizing issuance of orders to enforce provisions of EHPA); N.J.S.A. 26:13-28 (providing that EHPA does not preempt other laws or regulations that preserve to greater degree powers of Governor).

It is therefore clear that the EOs at issue, which temporarily closed fitness centers and limited the operations of such businesses during the existence of a declared state of emergency, did not have the effect of commandeering and utilizing plaintiff's property under N.J.S.A. App. A:9-34. Rather, the EOs had the effect of regulating such businesses, as permitted under N.J.S.A. App. A:9-40 and 9-45. And, the Disaster Control Act does not mandate that plaintiff be compensated for the impact of such regulation of its business.

Clearly, that was the Governor's intent. Where the Governor has permitted the taking of property under the Disaster Control Act, the Governor has expressly ordered that compensation be paid pursuant to the Act. For example, in Executive Order Number 113 (Apr. 2, 2020), 52 N.J.R. 833(a) (Apr. 20, 2020), the Governor authorized the OEM Director "to take or use personal services and/or real or personal property, including medical resources, for the purpose of protecting or promoting the public health, safety, or welfare," with "[c]ompensation [to] be provided following the procedures established by the Disaster Control Act, N.J.S.A. App. A:9-51." The fact that the Governor did not include similar language in the EOs under review indicates that the Governor did not intend to exercise his authority under N.J.S.A. App. A:9-34 to commandeer and utilize private property. Instead, the Governor intended to exercise his authority to regulate the operations of specified categories of businesses under N.J.S.A. App. A:9-40 and 9-45.

Having determined that plaintiff has no valid claim for compensation under the Disaster Control Act, we next consider plaintiff's contention that it is constitutionally entitled to compensation. To be sure, both the federal and state constitutions protect against a governmental taking of private property without just compensation. U.S. Const. amends. V, XIV; N.J. Const. art. I, ¶ 20. The

New Jersey constitutional protection is coextensive with its federal counterpart. Klumpp v. Borough of Avalon, 202 N.J. 390, 405 (2010); Mansoldo v. State, 187 N.J. 50, 58 (2006).

A constitutional taking may occur via a physical taking or a regulatory taking. Klumpp, 202 N.J. at 405; In re "Plan for Orderly Withdrawal from N.J." of Twin City Fire Ins. Co., 129 N.J. 389, 413 (1992). The distinction is significant to a court's analysis. Takings are more easily found when the government takes title to or physically occupies a property. Klumpp, 202 N.J. at 405. Moreover, the "longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 323 (2002).

In the present case, plaintiff's takings claims fail for numerous reasons. First, and most fundamentally, plaintiff has not asserted a recognizable property right for purposes of a constitutional takings claim. Plaintiff does not own the real property at issue; instead, it is a tenant. Moreover, the State has not physically taken any property owned by plaintiff. The State has not occupied,

22

or claimed ownership of, the physical property plaintiff leases, nor has it taken or seized any physical assets of plaintiff's business. See TJM 64, Inc. v. Harris, 475 F. Supp. 3d 828, 837 (W.D. Tenn. 2020) ("Plaintiffs' case does not implicate a physical taking, as the Government has not physically occupied Plaintiffs' limited service restaurants as a result of the July 8, 2019 COVID-19 Closure Order."). See also Tahoe-Sierra, 535 U.S. at 324 (noting that physical takings are relatively rare and easily identified).

Plaintiff's allegations relate to temporary regulatory restrictions on the ability to operate its business. However, conducting a business does not constitute a property right. The United States Supreme Court has observed the following distinction between an actual taking of property and regulations that impact the ability to conduct a business:

> The assets of a business (including its good will) unquestionably are property, and any state taking of those assets is unquestionably a "deprivation" under the Fourteenth Amendment. But business in the sense of the activity of doing business, or the activity of making a profit is not property in the ordinary sense . . . .
>
> [Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999).]

For that reason, "[t]o state a taking claim, it is not enough to allege that government conduct frustrated a business enterprise, as Plaintiffs have alleged

23

here. Takings jurisprudence is directed at government conduct that denies beneficial use of property, meaning things like legal interests in real or personal property, not the liberty interest to engage in business activity." Savage v. Mills, 478 F. Supp. 3d 16, 31 (D. Me. 2020) (citations omitted). See also Tuchman v. State, 878 A.2d 384, 393-94 (Conn. App. Ct. 2005) (finding notice of violation and denial of permit to transship hazardous waste, which interfered with the plaintiffs' ability to conduct their business, did not constitute taking of "property").

Even assuming that plaintiff had asserted a recognizable property right, its takings claim would fail when considered under a regulatory takings framework. As for regulatory takings, one categorical example occurs when governmental regulation denies all economically beneficial or productive use of a property. Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015-19, 1030 (1992); Klumpp, 202 N.J. at 405; Mansoldo, 187 N.J. at 58. However, not all temporary regulatory deprivations of economic use of property will constitute a compensable taking. Tahoe-Sierra, 535 U.S. at 334-35. Rather, the court must engage in a fact-specific inquiry, id. at 335, including consideration of the length of the deprivation. Id. at 342 (rejecting per se rule that moratorium on development lasting more than one year constituted a taking). Accord Penn.

24

Coal Co. v. Mahon, 260 U.S. 393, 413 (1922) (alleged regulatory takings require fact-intensive inquiries); Bernardsville Quarry, Inc. v. Borough of Bernardsville, 129 N.J. 221, 232 (1992) (same).

To determine whether a regulatory taking has occurred, we must consider the economic impact of the regulation on plaintiff, the extent to which the regulation has interfered with plaintiff's investment-backed expectations, and the character of the governmental action. Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 124 (1978); Mansoldo, 187 N.J. at 59; Bernardsville, 129 N.J. at 232-33. For example, in National Amusements, Inc. v. Borough of Palmyra, 716 F.3d 57, 60, 63 (3d Cir. 2013), the Third Circuit found no taking had occurred when the Borough of Palmyra ordered that an open-air flea market be closed for five months, due to safety concerns posed by unexploded munitions left behind when the site had been used by the United States Navy. The court stated: "It is difficult to imagine an act closer to the heartland of a state's traditional police power than abating the danger posed by unexploded artillery shells. Palmyra's emergency action to temporarily close the Market therefore constituted an exercise of its police power that did not require just compensation." Id. at 63.

A-0639-20

Also, in Pheasant Bridge Corp. v. Township of Warren, 169 N.J. 282, 296-98 (2001), the Court found no taking where the plaintiff's use of its property was temporarily limited while it was subjected to a zoning ordinance that was ultimately declared invalid as a result of a judicial challenge. The Court found that recognizing a taking under such circumstances "could have a chilling effect on land-use planning, for the adoption of an invalid ordinance could prove financially devastating to a municipality that was unsuccessful in its defense to a drawn-out constitutional challenge." Id. at 298.

In the present case, the facts do not support the existence of a compensable regulatory taking, temporary or otherwise. In terms of the economic impact of the EOs, and their interference with plaintiff's investment-backed expectations, it is clear the EOs had a significant impact on the operations of gyms and fitness centers. However, plaintiff was never deprived of all economic beneficial or productive use of its property. Although EOs 104 and 107 effectuated a complete shutdown of in-person operations at gyms and fitness centers for about three months, between March 16, 2020, and June 26, 2020, plaintiff admits that it offered live-streamed kickboxing classes during that timeframe and it made a business decision not to charge for these classes.

26

Also, since June 26, 2020 (three months after the shutdown was ordered), plaintiff was permitted to operate in-person fitness services on the property, subject to limitations. However, plaintiff did not take full advantage of the re-opening opportunities. For example, it does not appear to have offered individualized instruction, as permitted effective June 26, 2020, and it did not re-open its indoor space until October 12, 2020, notwithstanding that it was permitted to re-open effective September 1, 2020. And, plaintiff altered its fee structure, resulting in substantially lower revenue than its previous business model.

The State is not liable for a regulatory taking merely because the operations permitted resulted in lower revenue than plaintiff might have earned without the regulations in place. Pheasant Bridge, 169 N.J. at 298-301 (finding no taking where plaintiff's property remained useable notwithstanding limitations imposed by zoning ordinance that was ultimately invalidated as result of litigation); Gardner v. N.J. Pinelands Comm'n, 125 N.J. 193, 210 (1991) ("[R]estrictions on uses do not necessarily result in takings even though they reduce income or profits."). See also TJM 64, 475 F. Supp. 3d at 838 ("While it may not accord with Plaintiffs' pre-pandemic financial plans to operate their businesses in ways the Order allows, it does not follow that the Closure Order

27

has necessarily stripped Plaintiffs' businesses of all their value."). Indeed, gyms and fitness centers likely would have seen a drop-off in business due to the COVID-19 pandemic, even absent the EOs.

Finally, and most important, the nature of the governmental action strongly weighs against finding a taking. The limitations placed on plaintiff's business were not specific to plaintiff, or even to gyms and fitness centers as a group. The same or similar limitations were placed on numerous categories of businesses, and it is undisputed that these limitations constituted valid exercises of the State's police powers in the context of a public health emergency, to mitigate the spread of COVID-19.

Under these circumstances, we cannot find a compensable taking, recognizing the State's broad power to restrict the uses individuals may make of their property in order to protect the health, safety, and welfare of the public. Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 491-92 (1987); Nat'l Amusements, 716 F.3d at 63; In re "Plan for Orderly Withdrawal," 129 N.J. at 416. Our conclusion is in accord with numerous other courts that have rejected, or found little likelihood for success, on takings claims premised upon temporary closures and restrictions effectuated in response to the COVID-19 pandemic. See Auracle Homes, LLC v. Lamont, 478 F. Supp. 3d 199, 220-23

(D. Conn. 2020); <u>Baptiste v. Kennealy</u>, 490 F. Supp. 3d 353, 387-90 (D. Mass. 2020); <u>Bimber's Delwood, Inc. v. James</u>, 496 F. Supp. 3d 760, 782-85 (W.D.N.Y. 2020); <u>Blackburn v. Dare Cnty.</u>, 486 F. Supp. 3d 988, 995-1001 (E.D.N.C. 2020); <u>Elmsford Apt. Assocs., LLC v. Cuomo</u>, 469 F. Supp. 3d 148, 162-68 (S.D.N.Y. 2020); <u>Lebanon Valley Auto Racing Corp. v. Cuomo</u>, 478 F. Supp. 3d 389, 400-02 (N.D.N.Y. 2020); <u>Luke's Catering Serv., LLC v. Cuomo</u>, 485 F. Supp. 3d 369, 385-87 (W.D.N.Y. 2020); <u>Savage</u>, 478 F. Supp. 3d at 30-32; <u>TJM 64</u>, 475 F. Supp. 3d at 837-40; <u>Friends of DeVito v. Wolf</u>, 227 A.3d 872, 893-96 (Pa.), <u>cert. denied</u>, 141 S. Ct. 239 (2020). Notably, plaintiff has not presented any cases in which courts have found takings in this context. Under these circumstances, we conclude that plaintiff failed to establish that it was the victim of an uncompensated taking through the EOs at issue.

To the extent we have not specifically addressed any of plaintiff's remaining arguments, we find them to be without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0639-20